UNITED STATES of America, Plaintiff,

v.

Robert M. ENTIN, Gary B. Sack, Richard Gilliam, and Israel Discount Bank, Ltd., Defendants.

No. 84–2422–CIV.

United States District Court,
S.D. Florida.

Oct. 26, 1990.

Lori Miller and Dennis Egan, Dept. of Justice, Washington, D.C., for U.S.

Steven M. Kayman and Steven Stein, Proskauer, Rose, Goetz & Mendelsohn, New York City, Andrew Cotzin, Broad & Cassel, Miami, Fla., for Entin.

## MEMORANDUM OPINION

SCOTT, District Judge.

The plaintiff United States of America has brought this action pursuant to the False Claims Act. 31 U.S.C. 3729–3731. Reduced to its least common denominator, this case involves a calculated plan by three individuals and an international banking institution to defraud the United States Government out of a substantial amount of money. Specifically, the fraud was perpetrated in order to obtain a Small Business Investment Corporation license for the Miami Capital Corporation and, subsequently, to obtain funds from the Small Business Administration.

Following a hard fought round of pretrial motions[1] and discovery, this case proceeded to non-jury trial on all issues. Having exhaustively reviewed the entire record and applicable case authority, the Court now enters these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.

## FINDINGS OF FACT

1. Given the complex nature of this action as well as the number of parties involved in the underlying transaction, the Court shall proceed to briefly describe each of the major players involved:

A. The plaintiff, United States of America ("UNITED STATES or GOVERNMENT"), is acting on behalf of the Small Business Administration ("SBA"), one of its governmental agencies.

B. Defendant Robert M. Entin ("ENTIN") was at all times relevant the President and sole shareholder of the Miami Capital Corporation ("MCC").

C. MCC was a Florida corporation licensed and funded by the SBA to assist small businesses owned by socially and economically disadvantaged persons.

D. Defendant Gary B. Sack ("SACK") is an attorney admitted to practice in the state of Florida. At all times relevant, he represented MCC and Entin. In addition, he was a director of MCC.

E. Defendant Richard Gilliam ("GILLIAM") provided consulting services to MCC's principals regarding the licensing, funding and operation of MCC.

F. Defendant Israel Discount Bank, Ltd. ("ISRAEL") is an international bank with its main domestic office in New York. Israel has been registered to do business in Florida since January, 1978.

G. Alexander Halberstein, a non-party in this lawsuit, provided MCC's initial capitalization of $500,000.00.

2. This is a civil action brought by the United States pursuant to the False Claims Act. 31 U.S.C. §§ 3729–3731. The Government seeks damages and civil penalties from defendants Entin, Sack and Gilliam for conspiring to defraud the SBA. These defendants conspired to falsely represent to the SBA that MCC, a Small Business Investment Corporation ("SBIC"), had $500,000.00 of private, unincumbered and unrestricted capital. This was done in order to obtain a SBIC license for MCC and, subsequently, to obtain "matching funds" in the amount of $500,000.00 from the SBA.

In addition, the United States also seeks to recover damages from Israel and the individual defendants for presenting, or causing the presentation of, a false claim to the SBA. This was done by submitting documents or statements to the SBA knowing such representations to be false or fraudulent in that MCC did not have $500,000.00 in capital available for its use.

3. Pursuant to Section 301(d) of the Small Business Investment Act of 1958, 15 U.S.C. § 681(d), a corporation may become licensed as a Small Business Investment Company ("SBIC"). To be licensed as a SBIC, a licensee must have had in 1978, a minimum private capitalization of $150,-

---

**1.** The Court commends each of the attorneys for the excellent work product submitted through-

**514**

000.00.[2] Borrowed or incumbered funds are not considered private capital.[3] Therefore, such funds cannot be utilized to satisfy the minimum capitalization requirement. 13 C.F.R. 107.3(h).

4. The SBA distributes a document known as "Private Capital Requirements of SBIC's and Section 301(d) Licensees" to each licensee prior to the time of licensing. The purpose of this document is to provide guidance regarding the amount of private capital needed to qualify for licensing.

5. The requirement that a potential licensee for SBIC funds have private capital is a critical element to the SBIC program. As Patricia DiMuzio[4] testified, with private capital at risk there is a "much greater chance for the company to be managed properly and the SBA's funds to be managed properly."

6. In addition to the aforementioned capitalization information, the application for an SBIC license requires that a banking institution send the SBA a letter confirming the existence of deposits of cash or securities to the account of the potential licensee. Additionally, the bank must: (a). Clearly identify any incumbrance or restriction against such deposits; (b). List the names of all persons rendering professional or other services to the licensee and the amount of compensation to be paid for these services.

7. The SBIC Application expressly provides that all statements made in completion of the Application are material for the purpose of inducing the SBA to issue a license and provide funding.

8. On September 21, 1978, in connection with this license application, Ervin H. Golod, First Vice–President of Israel Discount Bank, verified to the SBA that $500,000.00

was on deposit in the name of MCC "without liens, encumbrances or restrictions of any kind."[5] At that time, this information was known to be false by Israel. The evidence at trial was overwhelming in this regard.

9. On March 27, 1978, MCC was incorporated under the laws of the State of Florida. Its principal place of business was Miami, Florida. On that same day, MCC applied for a license with the SBA.

10. Defendants Entin, Sack and Gilliam prepared the application on behalf of this corporation. In connection with this application, the following representations were made:

(a). MCC had a net paid-in capital and surplus of $495,000.00.

(b). The initial capital would be raised by selling one thousand shares of common stock at $500.00 a share.

(c). No one owned, either directly or indirectly, the corporation's shares nor would such shares be subject to any "loan or pledge incident to the purchase thereof." And,

(d). Defendant Entin had a personal net worth of $1,882,128.00.

This application was signed by Entin and attested to by Sack.

11. Defendant Entin knowingly and willfully submitted a Statement of Net Worth to the SBA on July 25, 1977, that was false and fraudulent in that it listed various shares of common stock and one hundred and twenty-five acres of land—none of which was owned by Entin.[6]

12. As president of MCC, Entin was responsible for having knowledge of the SBA regulations. Both he and Gilliam attended the pre-licensing conference at which the SBA regulations and rules were

out the course of this litigation.

2. This financial condition is imposed in order to assure that the company (SBIC) will be operated soundly and profitably.

3. However, borrowed funds may be used if the individual has a net worth of at least twice the amount borrowed. 13 C.F.R. 107.3. This provision is inapplicable in the present action.

4. Patricia DiMuzio has been a financial analyst with the SBA for the past fourteen years. She presently serves as Chief of Area 3. This area includes the state of Florida.

5. This verification was received in the form of a letter dated September 21, 1978.

6. Attached to this Statement of Net Worth were personal history statements from defendants Entin and Sack.

discussed, operational requirements detailed, and all questions were answered.

13. Entin was well aware that the material representations made to the SBA were false. In this regard, Entin did not require legal training or other expertise to realize that the representations regarding the source of MCC's funding were entirely false.

14. Defendant Sack was an active participant in the development of MCC and in MCC's dealings with the SBA. Sack also served as a director and attorney for MCC. Therefore, most of the documentation submitted to the SBA, including the Applications for Licensing and Funding, were prepared in Sack's office.

15. Additionally, at trial, defendant Sack admitted that he knew that the funds in question had to be unrestricted and unencumbered in order to qualify for an SBA license and funding. However, given the source of the initial funding, Sack was aware that the money was restricted and that this requirement could not be satisfied.

16. Defendant Gilliam was aware of the SBA regulations. In fact, Gilliam was the only individual associated with MCC that had previous dealings with the SBA or its programs prior to the instant situation.[7]

17. In addition, there was substantial evidence at trial that Gilliam knew the money in question was not unrestricted or unencumbered. Specifically, the following evidence was adduced at trial: (1) Gilliam testified that he had explained the requirements of the SBA program to Entin and Sack prior to the submission of the Application for License; (2) Gilliam reviewed the Application after its completion to assure its accuracy; (3) Gilliam attended the pre-licensing conference in Washington, D.C.; and (4) Defendant Sack recalled that Gilliam attended several meetings at which the source of the initial capitalization was discussed.[8] In fact, Sack testified that it was Gilliam who advised MCC not to disclose the source of the capital to the SBA.[9]

18. The evidence at trial also established that Entin, Sack, and Gilliam assisted MCC in making an unauthorized payment in the amount of $21,000.00 to Gilliam for his consulting services. The Court finds that this payment was not a valid investment in Black Investments, Inc. as Gilliam had asserted.

19. On October 6, 1978, based upon the false or fraudulent representations submitted, or caused to be submitted, by defendants Entin, Sack, Gilliam and Israel Discount Bank, the SBA approved the application and issued a license to MCC.

20. Once an entity is licensed, the SBA is authorized to fund the entity by purchasing its preferred stock.

21. On November 22, 1978, based upon these representations, the SBA purchased $500,000.00 worth of preferred stock from MCC.

22. Unbeknownst to the SBA, MCC had in fact used borrowed or incumbered funds to establish the initial capitalization of $500,000.00 for its licensing and funding.

23. The apparent injection of $500,-000.00 in private capital by Entin was accomplished through a joint venture agreement between MCC and Kan Rap Incorporated. Kan Rap, Inc. is a company controlled by Alexander Halberstein.

24. This joint venture agreement, dated September 6, 1978, was signed by Entin and Halberstein both individually and as the respective presidents of their corporations.[10] This agreement provided that Kan Rap, Inc. would, in effect, loan MCC $500,-000.00 by creating a certificate of deposit on its behalf. However, Kan Rap, Inc.

---

7. Defendant Gilliam testified that he had previously served as a consultant for at least ten corporations who had dealings with the SBA.

8. Similarly, Gail Columbus, Sack's secretary, testified that she had taken dictation at several meetings where the source of the initial capitalization was discussed.

9. Apparently, Gilliam was concerned that such disclosure would delay the funding from the SBA.

10. Defendant Sack prepared the drafts of the joint venture agreement—including the final signed agreement.

retained exclusive control over these funds.[11]

25. Israel was informed of the joint venture and the restrictions associated therewith prior to the time it represented to the SBA that the $500,000.00 in MCC's account was "without liens, encumbrances, or restrictions of any kind."

26. On March 31, 1982, the United States District Court for the Southern District of Florida appointed the SBA as receiver[12] for MCC.[13] In this capacity, the SBA was to pursue and preserve all of the corporation's claims. After satisfying all claims, the SBA recovered $80,044.96—thereby, leaving a net loss to the SBA of $419,955.14.

## II.

### CONCLUSIONS OF LAW

1. Before addressing the merits of the False Claims Act, a brief description of the history and purpose behind its enactment is necessary. This Act establishes a cause of action against persons making false claims upon the United States. It was originally enacted in 1863 in order to eliminate the wide-spread fraud often associated with Civil War defense contracts.[14] 132 Cong. Rec. H6482 (daily ed. Sept. 9, 1986) (statement of Rep. Rodino); Richard J. Oparil, "The Coming of the Amended False Claims

Act," 22 *Akron L.Rev.* 525, 526 (1989). Although the drafters' intent was admirable, the Act's practical effect left much to be desired. In fact, for over one hundred years the Act did little to combat the fraud it was intended to. However, in the 1980's, with "government fraud" apparently in vogue,[15] Congress decided to bolster the Act's effectiveness. In this regard, Senators Charles Grassley, Dennis DeConcini and Carl Levin introduced the False Claims Reform Act.[16] This amended legislation was intended to make The False Claims Act a more effective weapon against fighting fraudulent activity by, *inter alia,* reducing the Government's (or qui tam plaintiff's) burden of proof and standard of liability. The False Claims Reform Act was signed by President Reagan on October 27, 1986.

2. Prior to considering the "nuts and bolts" of the defendants' culpability, the Court must first resolve several threshold legal determinations.

■ 3. First, the Court must determine whether the 1986 amendments to The False Claims Act should be applied retroactively in this case. An analysis of retroactive legislation must begin with the seminal case of *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In a unanimous opinion, the Court stated that "a court is to apply the law in effect at the time it ren-

---

**11.** Specifically, the joint venture agreement provided as follows:

> Kan Rap, Inc. will immediately place the sum of $500,000.00 in Certificates of Deposit at the Israel Discount Bank in New York City, New York, said certificates to be in the name of Miami Capital Corporation. Said certificates are to be in the sole control of the officers of Kan Rap, Inc.

**12.** Defendant Entin and his attorneys participated in the initial receivership hearing and agreed to the appointment of a receiver prior to the hearing.

**13.** Case No. 82–0647–Civ.

**14.** This legislation was signed into law by President Abraham Lincoln. Act of Mar. 2, 1863, ch. 67 s. 3, 12 Stat. 698.

**15.** During the 1980's, fraud upon the government was at an all-time high. In fact, the "Pentagon Contract Fraud Scandal" may ultimately

prove to cost the federal treasury millions, if not billions, of dollars in unnecessary expenditures. *See e.g.,* "Another Teapot Dome Brewing," *Wash. Post,* June 17, 1988, at A2; "Contracts Scramble that Spawned a Scandal," *Financial Times,* June 22, 1988, s. I, at 4; "Payoffs at the Pentagon," *Newsweek,* June 27, 1988, at 3.

**16.** The need for this new legislation was vividly expressed by Senator Grassley when he stated the following:

> Current law put the Government at a critical disadvantage in fraud cases. Contractors have us over a barrel. Our choice is inexorably clear. If we like being over a barrel, I would suggest that we leave the law the way it is and instead grin and bear continued rapes and pillages of the Treasury. The alternative is true reform that shifts the advantage back to the Government where it belongs, and deal with fraud as those who elect us would expect.

131 Cong.Rec. 22322 (Aug. 1, 1985).

ders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board*, 416 U.S. at 711, 94 S.Ct. at 2016, 40 L.Ed.2d at 488; *see also, U.S. v. Kolter*, 849 F.2d 541 (11th Cir.1988); *Greer v. Skillcraft*, 704 F.Supp. 1570 (N.D.Ala. 1989); *U.S. v. Rent America, Corp.*, 734 F.Supp. 474 (S.D.Fla.1990). Neither the language of the 1986 amendments nor its legislative history addresses the issue of retroactivity.[17] *United States v. Hill*, 676 F.Supp. 1158 (N.D.Fla.1987); *United States v. Bekhrad*, 672 F.Supp. 1529 (S.D. Iowa 1987). Consequently, whether the amendments should be applied retroactively hinges upon whether such application would "result in manifest injustice." No one factor is determinative in considering whether manifest injustice would result. Having considered all of the circumstances involved herein, the Court is thoroughly convinced that such injustice will not result. Courts throughout the country are in agreement with this conclusion. *See e.g., Gravitt v. General Elec. Co.*, 680 F.Supp. 1162 (S.D.Ohio 1988).

Moreover, Congress knows how to limit the immediate applicability of new legislation if it so desires, as it did with two other contemporaneously passed civil fraud remedies. For instance, in the "Program Fraud Civil Remedies Act of 1986," [18] Congress specifically provided that "it was to apply to any claim made, presented, or submitted after the statute's effective date." Additionally, in the "Anti–Kickback Enforcement Act of 1986," [19] Congress provided that the Act shall apply to that conduct which is described as prohibited if it occurs after the date of enactment. Similarly, in the previous session of Congress, amendments to the False Claims Act applicable solely to Department of Defense contracts were specifically made applicable to claims submitted after the date of its enactment. *Department of Defense Authorization Act, 1986*, Pub.L. 99–145, 99 Stat. 583 (1985). The absence of similar language in The False Claims Act amendments of 1986 is indicative of the intent that they have retroactive application.

■ 4. Next, the defendants argue that the Court determine whether this cause of action is time-barred as a result of the statute of limitations having run. However, by previous Order dated October 6, 1986, the Court held that the statute of limitations had not run prior to the United States filing this lawsuit. Now, four years later, the Court ardently adheres to its previous holding.

The 1986 amendments to The False Claims Act changed the statute of limitations thereunder. The prior version of the Act simply stated that the action must be brought within six years from the date the violation was committed. 31 U.S.C. § 3731(b) (1982). The amended version is more complex:

> A civil action under section 3730 may not be brought
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
> whichever occurs last.

31 U.S.C. § 3731(b).

In the present action, the statute of limitations began to run once a claim for payment was submitted to the United States.[20]

---

17. The legislative history does indicate, however, that the legislators were anxious for the new amendments to take effect immediately. S.Rep. No. 345, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5267; *see also, United States v. Board of Education of Union City*, 697 F.Supp. 167 (D.N.J.1988).

18. Pub.L. 99–509, Title VI, Subtitle B, Section 6101, 100 Stat. 1874 (October 21, 1986).

19. Pub.L. 99–634, 100 Stat. 3523 (November 7, 1986).

20. In this regard, the Fifth Circuit has stated:
    Little need be said as to the statute of limitations. The six year period is to be computed from the time of the "commission of the act." . . . . The "act" in question is the filing of the false claim.

That claim was the Application for Funds submitted by defendants Entin, Sack and Gilliam on October 13, 1978.[21] This action was commenced by the filing of the complaint on October 12, 1984. Clearly, under the amended version of the statute of limitations, the present action has been timely brought.

■ 5. Having resolved these threshold issues, the Court shall now proceed to address the substantive merits of the False Claims Act. A violation of this Act must be established by a mere preponderance of the evidence. *Federal Crop Ins. Corp. v. Hester,* 765 F.2d 723 (8th Cir.1985); *United States v. Thomas,* 709 F.2d 968 (5th Cir. 1983); *Thevenot v. National Flood Insurance Program,* 620 F.Supp. 391 (D.C.La. 1985); *U.S. v. JT Const. Co., Inc.,* 668 F.Supp. 592 (W.D.Tex.1987). The applicable burden of proof was eased by the amended version of the False Claims Act.[22]

■ 6. Prior to 1986, the False Claims Act imposed civil liability for "knowingly" submitting a false claim to the SBA. 31 U.S.C. § 3729(1) (1982). However, pursuant to the 1986 amendments to this Act—specific intent to defraud is no longer required. Now, the Government must establish one of the following:

"(1) [the defendant] has actual knowledge of the information; (2) [the defendant] acts in deliberate ignorance of the truth or falsity of the information; or (3) [the defendant] acts in reckless disregard of the truth or falsity of the information...."

31 U.S.C. § 3729(b). The scienter standard was eased in order to preclude "ostrich" type situations, where an individual has "buried his head in the sand" and failed to make any inquiry which would have revealed the false claim. *See generally, False Claims Reform Act of 1985,*

S.Rep.No. 345, 99th Cong., 2nd Sess., reprinted in 1986 U.S.Code Cong. & Admin. News 5266. One congressional sponsor of the amended Act explained the new scienter standard:

While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the government. The Act is also intended not to permit artful defense counsel to require some proof of intent as an essential ingredient of proof....

132 Cong.Rec. H9389 (daily ed. Oct. 7, 1986) (statement of Rep. Bermar). Thus, actual knowledge is not a prerequisite to liability—constructive knowledge will suffice.

7. As thoroughly discussed in the foregoing factual section, the actions of each defendant have clearly satisfied the requisite knowledge requirement.

■ 8. Absent the capital which defendants represented had been deposited with Israel, MCC was ineligible for both the license and the SBA matching funds. 15 U.S.C. § 682(a). Paid-in capital was an explicit, statutory requirement to "assure a reasonable prospect that the company will be operated soundly and profitably, and managed actively and prudently in accordance with its articles of incorporation." 15 U.S.C. § 682(a). Significantly, this requirement that an applicant for federal funding have a substantial stake in the venture is of critical importance in several federal grant and loan programs. *See e.g.,* 13 C.F.R. 120.3(b)(2). Had MCC possessed the additional $500,000.00 in unencumbered funds, it would have greatly reduced the

*Smith v. United States,* 287 F.2d 299, 304 (5th Cir.1961).

21. A letter dated September 21, 1978, submitted by Mr. Golod of IDB to the SBA was a false statement that caused the false claim to be approved.

22. In the past, there had been some question as to the proper burden of proof to be applied in

False Claim actions. Circuits split on whether to apply the preponderance of the evidence or the clear and convincing evidence standard. *See e.g., Federal Crop Ins. Corp. v. Hester,* 765 F.2d 723 (8th Cir.1985); *United States v. Thomas,* 709 F.2d 968 (5th Cir.1983); *United States v. Milton,* 602 F.2d 231 (9th Cir.1979); *United States v. Lawson,* 522 F.Supp. 746 (D.N.J.1981).

risk that the Government's investment would become worthless. The Court concludes that but for the defendants' conduct, the SBA, by statute and regulation, could not have disbursed the $500,000.00 and would not have lost any money.

9. The Government has established an adequate causal relationship between the defendants' conduct, the disbursement of funds and the eventual loss. The holding in *United States v. Hibbs* is readily distinguishable. *United States v. Hibbs*, 568 F.2d 347 (3d Cir.1977). In the present action, the defendants' statements regarding the capitalization of Miami Capital Corporation bear directly on credit worthiness and the value of the stock purchased by the SBA. *See, United States v. Miller*, 645 F.2d 473, 476 (5th Cir.1981) (The court held that false statements regarding credit worthiness and value of security have the requisite causal connection to a subsequent default); *United States v. Hill*, 676 F.Supp. 1158 (N.D.Fla.1987). Therefore, *Hibbs* is inapplicable to these facts.[23]

■ 10. Ervin Golod's knowledge of the falsity of the September 21, 1978 letter that he sent to the SBA is imputed to his employer, defendant Israel. When this letter was written, Golod was acting in the course of his employment and for the benefit of his employer. *United States v. DiBona*, 614 F.Supp. 40 (E.D.Pa.1984); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3rd

Cir.1978); *United States v. Hughes*, 585 F.2d 284 (7th Cir.1978); 10 W. Fletcher, *Cyclopedia Corporation*, 4886, p. 399 (rev. ed. 1978).[24]

■ 11. Next, the Court must determine the amount of damages suffered by the Government as a result of the defendants' conduct. In this regard, 31 U.S.C. § 3729 provides as follows:

(a) Liability for certain acts.—Any person who [violates this Act]:

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.... A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

31 U.S.C. § 3729.[25] Based upon this statutory provision, the Court calculates the damages as follows:

1. A civil penalty of $5,000.00 is imposed against each of the defendants jointly and severally.

2. The Government has sustained damages in the amount of $500,000.00. The case authority holds that such damages should be tripled before any deductions are made.[26] *See e.g., United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). Therefore, under the

**23.** Furthermore, in referring to subsection (b) of 31 U.S.C. § 3729, the Senate Report states:

When the Government changes its position, and commits its financial resources based upon a material false statement, it should be able to recover the resulting losses, but, under some court interpretations, it may not. For instance, in *United States v. Hibbs*, 568 F.2d 347 (3d Cir.1977), the FHA agreed to insure a mortgage based upon a representation, which was false, that the residence was habitable and in compliance with the housing code. The Government will not issue insurance to a non-code conforming house. However, the court ruled that the default on the mortgage occurred because the borrower lost his job, and therefore could not meet his monthly payments—that the default was not related to the false statement. While the court may have been technically correct, the Committee believes that this position is unsound public policy. The act should cover representations

which cause the Government to change its position and pledge its full faith and credit, including the risk of insurable loss, based upon another, but material false statement. S.Rep. No. 99–345 (1986).

**24.** The present action is distinguishable from *United States v. Ridglea State Bank*, 357 F.2d 495, 498 (5th Cir.1966), where the bank officials' purpose was most certainly not to benefit his employer bank.

**25.** This particular section of the False Claims Act may be applied retroactively. *See e.g., U.S. v. Board of Educ. of City of Union City*, 697 F.Supp. 167 (D.N.J.1988).

**26.** This method of computation most faithfully conforms to the language and purpose of the False Claims Act. The Act speaks of tripling "damages" and not tripling "net damages" or "uncompensated damages."

directive of the Act the damages are tripled to $1,500,000.00. Next, the Court deducts the $80,044.96 recovered by the receiver. In conclusion, the amount of damages is $1,419,955.14. The defendants are jointly and severally liable for this award of damages.

3. The defendants are jointly and severally liable for the costs of this lawsuit.

## III.

## LEGAL DETERMINATIONS

Based upon the foregoing analysis and the authorities cited therein, the Court concludes that each defendant acted so as to violate the False Claims Act. 31 U.S.C. §§ 3729–3731. The egregious nature of the conduct at issue constrains the Court from reaching a contrary result. To hold otherwise would be to place the imprimatur of law on nothing short of an intentional looting of the Federal Treasury.

Counsel for the Government shall submit a Final Judgment consistent within this Memorandum Opinion within five (5) days of the date of this Order.

DONE and ORDERED.