**UNITED STATES** of America, Plaintiff,

v.

**George O. KRIZEK and Blanka H. Krizek, Defendants.**

**Civ. A. No. 93–54.**

United States District Court, D. Columbia.

July 19, 1994.

---

Bruce R. Hegyi, U.S. Attys. Office, Washington, DC, John Robert Munich, U.S. Attys. Office, Jefferson City, MO, for plaintiff U.S.

Brian William Shaughnessy, Shaughnessy, Borowski & Gagner, Joseph Nathan Onek, Michael Eberhardt, Crowell & Moring, Marsha Ellen Swiss, Monika Blanche Krizek, Washington, DC, for defendants George and Blanka Krizek.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

On January 11, 1993, the United States filed this civil suit against George O. Krizek,

M.D. and Blanka H. Krizek under the False Claims Act, 31 U.S.C. §§ 3729–3731, and at common law. The government brought the action against the Krizeks alleging false billing for Medicare and Medicaid patients. The five counts include claims for (1) "Knowingly Presenting a False or Fraudulent Claim", 31 U.S.C. § 3729(a)(1); (2) "Knowingly Presenting a False or Fraudulent Record", 31 U.S.C. § 3729(a)(2); (3) "Conspiracy to Defraud the Government"; (4) "Payment under Mistake of Fact"; and (5) "Unjust Enrichment". In its claim for relief, the government asks for triple the alleged actual damages of $245,392 and civil penalties of $10,000 for each of the 8,002 allegedly false reimbursement claims pursuant to 31 U.S.C. § 3729.

The government alleges two types of misconduct related to the submission of bills to Medicare and Medicaid. The first category of misconduct relates to the use of billing codes found in the American Medical Association's "Current Procedural Terminology" ("CPT"), a manual that lists terms and codes for reporting procedures performed by physicians. The government alleges that Dr. Krizek "up-coded" the bills for a large percentage of his patients by submitting bills coded for a service with a higher level of reimbursement than that which Dr. Krizek provided. As a second type of misconduct, the government alleges Dr. Krizek "performed services that should not have been performed at all in that they were not medically necessary." Original Complaint ¶ 24.

Given the large number of claims, and the acknowledged difficulty of determining the "medical necessity" of 8,002 reimbursement claims, it was decided that this case should initially be tried on the basis of seven patients and two hundred claims that the government believed to be representative of Dr. Krizek's improper coding and treatment practices. *See* Order of March 9, 1994. It was agreed by the parties that a determination of liability on Dr. Krizek's coding practices would be equally applicable to all 8,002 claims in the complaint. A three week bench trial ensued.

*Findings of Fact*

Dr. Krizek is a psychiatrist. Dr. Krizek's wife, Blanka Krizek was responsible for overseeing Dr. Krizek's billing operation for a part of the period in question. Dr. Krizek's Washington, D.C. psychiatric practice consists in large part in the treatment of Medicare and Medicaid patients. Much of Doctor Krizek's work involves the provision of psychotherapy and other psychiatric care to patients at the Washington Hospital Center.

Under the Medicare and Medicaid systems, claims for reimbursement are submitted on documents known as Health Care Financing Administration ("HCFA") 1500 Forms. These forms are supposed to contain the patient's identifying information, the provider's Medicaid or Medicare identification number, and a description of the provided procedures for which reimbursement is sought. These procedures are identified by a standard, uniform code number as set out in the American Medical Association's "Current Procedural Terminology" ("CPT") manual, a book that lists the terms and codes for reporting procedures performed by physicians.

Dr. Krizek was a voluntary "participating provider" in the Medicare and Medicaid programs. As a participating provider, Dr. Krizek was required to follow the billings and documentation requirements of Medicare/Medicaid and Pennsylvania Blue Shield ("PBS"), the Medicare carrier for the greater Washington, D.C. area. Providers were informed of Medicare/Medicaid rules and directions through the CPT manual and the Medicare Reports and Medicare Bulletins.

The Medicare reports that Dr. Krizek received indicated that he was to maintain documentation for each claim he submitted to Medicare. These reports noted that hospital progress notes and patient office records must verify that a service 1) actually was provided, 2) was performed at the level reported, and 3) was medically necessary. The Medicare Reports stated that refunds would be requested for any payments made by Blue Shield not supported by hospital records. *See* Gov. Exh. 6 & 7.

The CPT manuals contained billing numbers to be used by providers when submitting claims to Medicare/Medicaid for reimbursement. The claim number submitted by

or on behalf of the provider describes by code the service rendered and constitutes the provider's claim for such service. The submission of a claim on the HCFA 1500 form is a certification by the provider to the government of the correctness of the information submitted and, among other things, that the services were performed by the provider, and that the provider will maintain "such records as are necessary to disclose fully the extent of the services provided...." *See* Government Exh. 5.

The government in its complaint alleges both improper billing for services provided and the provision of medically unnecessary services. The latter of these two claims will be addressed first.

*Medical Necessity*

■ The record discloses that Dr. Krizek is a capable and competent physician. Dr. Krizek was originally trained in Prague, in what was then Czechoslovakia, at the Charles University School of Medicine. Dr. Krizek also received a medical degree from Rudolf's University, in Vienna, Austria. Dr. Krizek came to the United States in 1968, where he did a residency at Beth Israel Hospital in New York City. He arrived in the Washington, D.C. area in the early 1970's where he has been engaged in the practice of psychiatry for approximately 21 years. The trial testimony of Dr. Krizek, his colleagues at the Washington Hospital Center, as well as the testimony of a former patient, established that Dr. Krizek was providing valuable medical and psychiatric care during the period covered by the complaint. The testimony was undisputed that Dr. Krizek worked long hours on behalf of his patients, most of whom were elderly and poor.

Many of Dr. Krizek's patients were afflicted with horribly severe psychiatric disorders and often suffered simultaneously from other serious medical conditions. For example, one of the seven representative patients had paranoid psychosis and organic brain dementia, coupled with a series of other medical problems including colon cancer, diabetes, herpes, and viral encephalitis. Another patient suffered from chronic depression and had accompanying delusions. A third had a history of repeated psychiatric hospitaliza-

tions, was in an acute schizophrenic state, and also suffered from epilepsy. A fourth patient suffered from suicidal and assaultive behavior, hallucinations, paralysis of the left side of the body, and was an intravenous cocaine and heroin user.

The government takes issue with Dr. Krizek's method of treatment of his patients, arguing that some patients should have been discharged from the hospital sooner, and that others suffered from conditions which could not be ameliorated through psychotherapy sessions, or that the length of the psychotherapy sessions should have been abbreviated. The government's expert witness's opinions on this subject came from a cold review of Dr. Krizek's notes for each patient. The government witness did not examine or interview any of the patients, or speak with any other doctors or nurses who had actually served these patients to learn whether the course of treatment prescribed by Dr. Krizek exceeded that which was medically necessary.

Dr. Krizek testified credibly and persuasively as to the basis for the course of treatment for each of the representative patients. The medical necessity of treating Dr. Krizek's patients through psychotherapy and hospitalization was confirmed via the testimony of other defense witnesses. The Court credits Dr. Krizek's testimony on this question as well as his interpretation of his own notes regarding the seriousness of each patients' condition and the medical necessity for the procedures and length of hospital stay required. The Court finds that the government was unable to prove that Dr. Krizek rendered services that were medically unnecessary.

*Improper Billing*

■ On the question of improper billing or "up-coding", the government contends that for approximately 24 percent of the bills submitted, Dr. Krizek used the CPT Code for a 45–50 minute psychotherapy session (CPT Code 90844) when he should have billed for a 20–30 minute session (CPT Code 90843). The government also contends that for at least 33 percent of his patients, Dr. Krizek billed for a full 45–50 minute psycho-

therapy session, again by using CPT code 90844, when he should have billed for a "minimal psychotherapy" session (CPT 90862). These two latter procedures are reimbursed at a lower level than 90844, the 45–50 minute psychotherapy session, which the government has referred to as "the Cadillac" of psychiatric reimbursement codes.

The primary thrust of the government's case revolves around the question whether Dr. Krizek's use of the 90844 CPT code was appropriate. For the most part, the government does not allege that Dr. Krizek did not see the patients for whom he submitted bills. Instead, the government posits that the services provided during his visits either did not fall within the accepted definition of "individual medical psychotherapy" *or*, if the services provided *did* fit within this definition, the reimbursable service provided was not as extensive as that which was billed for. In sum, the government claims that whenever Dr. Krizek would see a patient, regardless of whether he simply checked a chart, spoke with nurses, or merely prescribed additional medication, his wife or his employee, a Mrs. Anderson, would, on the vast majority of occasions, submit a bill for CPT code 90844— 45–50 minutes of individual psychotherapy.

In presenting its case that Dr. Krizek did not provide the billed-for services as required by the CPT, the government contends that the definition of the 90844 code *requires* 45– 50 minutes of *"face-to-face"* contact with the patient. By example, if a doctor were to spend 10 minutes reviewing a patient's file and talking to nurses about the patient's condition, then spend 20 minutes in a face-to-face psychiatry session with the patient, and finally take an additional fifteen minutes after the session to consult with the patient's spouse or prescribe medication, this would,

according to the government, count only as a 20–30 minute individual psychotherapy session, to be billed as code 90843. Under the government's interpretation of the code, even if as much as an hour of a physician's time is devoted to a patient's case, with half that time spent in a face-to-face psychotherapy session and the rest spent on related services, the doctor is only permitted reimbursement under the 90800 series of codes for the 30 minutes spent face-to-face. The 90800 series of codes is described as follows in the documents sent by PBS to the Krizeks during the relevant time period:

| Code | Description of Services |
|------|------------------------|
| 90841 | Individual medical psychotherapy by a physician, with continuing medical diagnostic evaluation, and drug management when indicated, including insight oriented, behavior modifying or supportive psychotherapy; time unspecified. |
| 90843 | Approximately 20 to 30 minutes. |
| 90844 | Approximately 45 to 50 minutes. |

The government's witnesses [1] testified that as initially conceived, the definition of the CPT codes is designed to incorporate the extra time spent in its level of reimbursement. It was expected by the authors of the codes that for a 45–50 minute 90844 session a doctor would spend additional time away from the patient reviewing or dictating records, speaking with nurses, or prescribing medication. The government's witnesses testified that the reimbursement rate for 90844 took into account the fact that on a 45– 50 minute session the doctor would likely spend twenty additional minutes away from the patient. As such, the doctor is limited to billing for time actually spent "face-to-face" with the patient.

Dr. and Mrs. Krizek freely admit that when a 90844 code bill was submitted on the

---

**1.** One of whom was Barton C. McCann, M.D., M.P.H., formerly Chief Medical Officer of the National Health Service Corps, and formerly Chief of the Special Coverage Issues Branch of the Office of Coverage Policy of the Health Coverage Financing Administration. Dr. McCann has been a member of the CPT Editorial Panel of the American Medical Association.

doctor's behalf, it did not always reflect 45–50 minutes of face-to-face psychotherapy with the patient. Instead, the 45–50 minutes billed captured generally the total amount of time spent on the patient's case, including the "face-to-face" psychotherapy session, discussions with medical staff about the patient's treatment/progress, medication management, and other related services. Dr. Krizek referred to this as "bundling" of services, all of which, Dr. and Mrs. Krizek testified, they reasonably believed were reimbursable under the 90844 "individual medical psychotherapy" code.

Defendant's witnesses testified that it was a common and proper practice among psychiatrists nationally, and in the Washington, D.C. area, to "bundle" a variety of services, including prescription management, review of the patient file, consultations with nurses or the patients' relatives into a bill for individual psychotherapy, whether or not these services took place literally in view of the patient. Under the defense theory, if a doctor spent 20 minutes in a session with a patient and ten minutes before that in a different room discussing the patient's symptoms with a nurse, and fifteen minutes afterwards outlining a course of treatment to the medical staff, it would be entirely appropriate, under their reading and interpretation of the CPT, to bill the 45 minutes spent on that patients' care by using CPT code 90844.

The testimony of the defense witnesses on this point was credible and persuasive. These witnesses included Dr. Chester Schmidt, Associate Dean of Johns Hopkins Medical School who serves on the editorial panel of the CPT and on the American Psychiatric Association Committee on Codes and Reimbursement, Dr. Tracy Gordy, former President of the Texas Psychiatric Association who also serves on the CPT editorial panel and the APA committee, and four psychiatric professionals who worked with Dr. Krizek as a member of the medical staff at the Washington Hospital Center. The CPT codes which the government insists require

face-to-face rendition of services never used the term "face-to-face" in its code description during the time period covered by this litigation.[2] The relevant language describing the code is ambiguous.

The Court finds that the government's position on this issue is not rational and has been applied in an unfair manner to the medical community, which for the most part is made up of honorable and dedicated professionals. One government witness testified that a 15 minute telephone call made to a consulting physician in the patient's presence would be reimbursable, while if the doctor needed to go outside the patient's room to use the telephone—in order to make the *same* telephone call—the time would not be reimbursable. In addition, the government witnesses testified that if a doctor should happen to spend 25 minutes with a patient in psychotherapy, and 20 minutes working away from the patient on other matters for the patient, then the doctor should bill for a 20 minute 90843 session, and should submit a second claim for the non-face-to-face time (using, for example, the 90862 code—pharmacological management). The government's witnesses admitted that submitting two bills in this way would result in payment for only one submission, as the relevant government reimbursement practice only permits reimbursement for one procedure at a given time. Dual billing, despite the lack of payment, is nevertheless required under the government witnesses' interpretation of the relevant rules.

The Court will not impose False Claims Act liability based on such a strained interpretation of the CPT codes. The government's theory of liability is plainly unfair and unjustified. Medical doctors should be appropriately reimbursed for services legitimately provided. They should be given clear guidance as to what services are reimbursable. The system should be fair. The system cannot be so arbitrary, so perverse, as to subject a doctor whose annual income during

2. The scope of this lawsuit covers bills submitted by the Krizeks between January 1986 and March 1992. In 1992, the CPT code book was revised to introduce "evaluation and management codes" to cover non-procedure, non-surgical oriented services. Only since the introduction of the evaluation and management codes has the term "face-to-face" appeared in the guidelines section of the CPT.

the relevant period averaged between $100,-000 and $120,000, to potential liability in excess of 80 million dollars [3] because telephone calls were made in one room rather than another.

The Court finds that Doctor Krizek did not submit false claims when he submitted a bill under CPT Code 90844 after spending 45–50 minutes working on a patient's case, even though not all of that time was spent in direct face-to-face contact with the patient. Even Dr. Reznik, PBS's reviewer and the government's expert psychiatric witness acknowledged that Dr. Krizek provided important services during non-face-to-face time:

> Now certainly, in both inpatient and outpatient practices, one does other things for the patient. That's good medical care, and its appropriate. And what Dr. Krizek indicated in some of his statements that he did, are certainly appropriate and proper care. But it is not appropriate to include those in individual medical psychotherapy.

Reznik Testimony, Vol. III at 21. The Court finds that the defendants' "bundled" services interpretation of the CPT code 90844 is not inconsistent with the plain, common-sense reading of the "description of services" listed by Pennsylvania Blue Shield in its published Procedure Terminology Manual.

*Billing Irregularities*

█ While Dr. Krizek was a dedicated and competent doctor and cannot be faulted for his interpretation of the 90844 code, his billing practices, or at a minimum his oversight of his wife's and Mrs. Anderson's billing system, was seriously deficient. Dr. Krizek knew little or nothing of the details of how the bills were submitted by his wife and Mrs. Anderson. Mrs. Krizek was responsible for submitting to Medicare/Medicaid claims for reimbursement for the patients who were admitted to Dr. Krizek's service at the Washington Hospital Center and for those few Medicare/Medicaid outpatients Dr. Krizek saw in his home. Mrs. Anderson was responsible for submitting bills when Dr. Krizek saw as "consults" Medicare/Medicaid patients who were admitted to another physician's service at Washington Hospital Center, and when Dr. Krizek was "covering" for other physicians.

The basic method of billing by Mrs. Krizek and Mrs. Anderson was to determine which patients Dr. Krizek had seen, and then to assume what had taken place was a 50-minute psychotherapy session, unless told specifically by Dr. Krizek that the visit was for a shorter duration. Mrs. Krizek frequently made this assumption without any input from her husband. Mrs. Krizek acknowledged at trial that she never made any specific effort to determine exactly how much time was spent with each patient. Mrs. Krizek felt it was fair and appropriate to use the 90844 code as a rough approximation of the time spent, because on some days, an examination would last up to two hours and Mrs. Krizek would still bill 90844.

Mrs. Anderson also would prepare and submit claims to Medicare/Medicaid with no input from Dr. Krizek. Routinely, Mrs. Anderson would simply contact the hospital to determine what patients were admitted to various psychiatrists' services, and would then prepare and submit claims to Medicare/Medicaid without communicating with Dr. or Mrs. Krizek about the claims she was submitting and certifying on Dr. Krizek's behalf. At the most, Mrs. Anderson would occasionally call Dr. Krizek and ask if his service for a particular patient was for a "short session." Dr. Krizek would tell Mrs. Anderson "yes" or "no." For those "short sessions," Mrs. Anderson would submit a bill for 90843—a 20–30 minute psychotherapy session. With few exceptions, Mrs. Anderson submitted 90844 claims to Medi-

---

3. The government alleges in the complaint that overbills amounted to $245,392 during the six-year period covered by the lawsuit. Trebling this damage amount, and adding the $10,000 statutory maximum penalty requested by the government for each of the 8,002 alleged false claims, results in a total potential liability under the complaint of more than $80,750,000. Dr. Krizek is not public enemy number one. He is at worst, a psychiatrist with a small practice who keeps poor records. For the government to sue for more than eighty million dollars in damages against an elderly doctor and his wife is unseemly and not justified. During this period, a psychiatrist in most instances would be reimbursed between $48 and $60 for a 45–50 minute session and $40 or less for a 20–30 minute session. This is hardly enough for any professional to get rich.

care/Medicaid for Dr. Krizek's services. Because of the lack of communication among Dr. Krizek, Mrs. Krizek and Mrs. Anderson, and the absence of any centralized, controlled billing system, on several occasions duplicate bills were submitted by Mrs. Krizek and Mrs. Anderson on Dr. Krizek's behalf.

The net result of this system, or more accurately "nonsystem," of billing was that on a number of occasions, Mrs. Krizek and Mrs. Anderson submitted bills for 45–50 minute psychotherapy sessions on Dr. Krizek's behalf when Dr. Krizek could not have spent the requisite time providing services, face-to-face, or otherwise. For example, on March 9, 1985 Dr. Krizek submitted to Medicare and Medicaid 23 claims for 90844 (45–50 minutes of individual medical psychotherapy) and 5 claims for 90843 (25–30 minutes of individual medical psychotherapy). These 29 claims totaled 21.5 hours of services provided during one 24 hour period. In August 31, 1985, thirty 90844's and one 90843 were submitted.[4] At minimum, this is the equivalent of 23 hours in patient services in a 24 hour period. While Dr. Krizek may have been a tireless worker, it is difficult for the Court to comprehend how he could have spent more than even ten hours in a single day serving patients. By comparison, defense witness Dr. Norman Wilson, former head of the Department of Psychiatry at the Washington Hospital Center, testified that while he often worked 70–hour weeks on the care and treatment of his own patients, he could not recall ever submitting more than twelve 90844 claims for reimbursement in a single day. Wilson Testimony, Vol. VI at 163–64. The defendants do not deny that these unsubstantiated reimbursement claims occurred or that billing practices which led to such inaccurate billings continued through March of 1992.

While the Court does not find that Dr. Krizek submitted bills for patients he did not see, the Court does find that because of Mrs. Krizek's and Mrs. Anderson's presumption that whenever Dr. Krizek saw a patient he worked at least 45 minutes on the matter, bills were improperly submitted for time that was not spent providing patient services. Again, the defendants admit this occurred. See Defendant's Post-trial Memorandum at 11–12.

At the conclusion of the trial, both parties agreed that an appropriate bench-mark for excessive billing would be the equivalent of twelve 90844 submissions (or nine patient-service hours) in a single service day. See Defendant's Post-trial Memorandum at 16; Government's Proposed Memorandum and Opinion at 11. Considering the difficulty of reviewing all Dr. Krizek's patient records over a seven-year period, Dr. Wilson's testimony as to having submitted as many as twelve 90844 submissions in a single day, and giving full credence to unrefuted testimony that Dr. Krizek worked very long hours, the Court believes this to be a fair and reasonably accurate assessment of the time Dr. Krizek actually spent providing patient services. See *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946) (permitting factfinder to make "just and reasonable estimate of damage based on relevant data" where more precise computation is not possible). Dr. and Mrs. Krizek will therefore be presumed liable for bills submitted in excess of the equivalent of twelve 90844 submissions in a single day.

*Nature of Liability*

■ While the parties have agreed as to the presumptive number of excess submissions for which Dr. and Mrs. Krizek may be found liable, they do not agree on the character of the liability. The government submits that the Krizeks should be held liable under the False Claims Act, 31 U.S.C. § 3729, *et seq.* By contrast, defendants posit that while the United States may be entitled to reimbursement for any unjust enrichment attributable to the excess billings, the Krizeks' conduct with regard to submission of excess bills to Medicare/Medicaid was at most negligent, and not "knowing" within the definition of the statute. In their defense, defendants emphasize the "Ma and Pa" nature of Dr.

4. The scope of this lawsuit covers the period between January 1, 1986 and March 31, 1992. Because the Krizeks' billing practices remained unchanged both prior to and during the time period covered by this lawsuit, the Court admitted into evidence bills submitted in 1985 as probative of the Krizeks' billing practices during the period of the lawsuit.

Krizek's medical practice, the fact that Mrs. Krizek did attend some Medicare billing seminars in an effort to educate herself, and the fact that Mrs. Krizek consulted hospital records and relied on information provided by her husband in preparing bills.

█ By its terms, the False Claims Act provides, *inter alia*, that:

Any person who—

(1) knowingly presents, or causes to be presented, to [the Government] ... a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

.    .    .    .    .

is liable to the United States Government for a civil penalty of not less than $5,000.00 and not more than $10,000.00, plus three times the amount of damages which the Government sustains because of the act of that person....

31 U.S.C. § 3729(a). The mental state required to find liability under the False Claims Act is also defined by the statute:

For the purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent is required.

31 U.S.C. § 3729(b). The provision allowing for a finding of liability without proof of specific intent to defraud was a feature of the 1986 amendments to the Act. As explained by one of the 1986 Act's sponsors:

While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the government are prepared in such a

sloppy or unsupervised fashion that [it] resulted in overcharges to the government.

*United States v. Entin,* 750 F.Supp. 512, 518 (S.D.Fla.1990) (quoting 132 Cong.Rec. H9389 (daily ed. Oct. 7, 1986) (Statement of Rep. Berman)). While the claims in this case were submitted to Pennsylvania Blue Shield as an insurance carrier, because the company is ultimately reimbursed by the Government, false Medicare and Medicaid claims submitted through Pennsylvania Blue Shield are held to violate the Act. *See* 31 U.S.C. § 3729(c) (defining claim to be any "request or demand" where the "United States Government provides any portion of the money or property which is requested or demanded"); *See also Peterson v. Weinberger,* 508 F.2d 45, 49 (5th Cir.1975) *cert. denied* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975) (false Medicare claims sent to Blue Cross/ Blue Shield of Texas gave rise to liability under the False Claims Act); *United States ex rel. Fahner v. Alaska,* 591 F.Supp. 794, 798–99 (N.D.Ill.1984) (submission of false Medicaid claims to Illinois Department of Public Aid gave rise to liability under False Claims Act).

The Court finds that, at times, Dr. Krizek was submitting claims for 90844 when he did not provide patient services for the requisite 45 minutes. The testimony makes clear that these submissions were made by Mrs. Krizek or Mrs. Anderson with little, if any, factual basis. Mrs. Krizek made no effort to establish how much time Dr. Krizek spent on a particular matter. Mrs. Krizek and Mrs. Anderson simply presumed that 45–50 minutes had been spent. There was no justification for making that assumption. In addition, Dr. Krizek failed utterly in supervising these agents in their submissions of claims on his behalf. As a result of his failure to supervise, Dr. Krizek received reimbursement for services which he did not provide.

These were not "mistakes" nor merely negligent conduct. Under the statutory definition of "knowing" conduct, the Court is compelled to conclude that the defendants acted with reckless disregard as to the truth or falsity of the submissions. As such, they

will be deemed to have violated the False Claims Act.

## Conclusion

■ Dr. Krizek must be held accountable for his billing system along with those who carried it out. Dr. Krizek was not justified in seeing patients and later not verifying the claims submitted for the services provided to these patients. Doctors must be held strictly accountable for requests filed for insurance reimbursement.

■ The Court believes that the Krizeks' billing practices must be corrected before they are permitted to further participate in the Medicare or Medicaid programs. Therefore an injunction will issue, enjoining the defendants from participating in these systems until such time as they can show the Court that they can abide by the relevant rules.

The Court also will hold the defendants liable under the False Claims Act on those days where claims were submitted in excess of the equivalent of twelve (12) 90844 claims (nine patient-treatment hours) in a single day and where the defendants cannot establish that Dr. Krizek legitimately devoted the claimed amount of time to patient care on the day in question. The government also will be entitled to introduce proof that the defendants submitted incorrect bills when Dr. Krizek submitted bills for less than nine (9) hours in a single day. The assessment of the amount of overpayment and penalty will await these future proceedings.

## Other Observations

While the Court does not discount the seriousness of the Krizeks' conduct here, this case demonstrates several flaws in this country's government health insurance program. The government was right in bringing this action, because it could not countenance the reckless nature of the reimbursement systems in this case. While we are in an age of computers, this does not mean that we can blindly allow coding systems to determine the amount of reimbursement without the physician being accountable for honestly and correctly submitting proper information, whether by code or otherwise.

Nonetheless, the Court found rather troubling some of the government's procedures that control reimbursements paid to providers of services. Here are some of these practices:

1) The government makes no distinction in reimbursement as to the status or professional attainment or education of the provider. Thus, a non-technical person rendering a coded service will be reimbursed the same amount as a board-certified physician.

2) The sums that the Medicare and Medicaid systems reimburse physicians for services rendered seem to be so far below the norm for charges reimbursed by non-governmental insurance carriers. Indeed, the amount could hardly support a medical practice. As the evidence shows in this case, Board certified physicians in most instances were paid at a rate less than $60 per hour and less than $35 per ½ hour. The government must certainly review these charges because if providers are not adequately compensated, they may not provide the level of care that our elderly and underprivileged citizens require. What is more, the best physicians will simply not come into the system or will refuse to take on senior citizens or the poor as patients.

3) The unrealistic billing concept of requiring doctors to bill only for face-to-face time is not consistent with effective use of a doctor's time or with the provision of good medical services. Doctors must be able to study, research, and discuss a patient's case and be reimbursed for such time.

4) When Medicare dictates that a physician must report each service rendered as a separate code item, the physician is entitled to believe that he will be reimbursed for each of the services rendered. In actuality, the system pays for only one of the multitude of services provided. If this were done by a private sector entity, it would be considered deceitful. Because the government engages in such a deceitful practice does not make it right.

These are the lessons learned by this Court during this case. Hopefully, HCFA

will reexamine its reimbursement practices to see what, if any, changes should be made.