UNITED STATES of America, Plaintiff,

v.

DOMESTIC INDUSTRIES, INC., Domestic Industries of Virginia, Inc., John C. Santoro, Jr., and Joseph C. Santoro, Defendants.

and

Domestic Industries, Inc., Domestic Industries of Virginia, Inc., John C. Santoro, Jr., and Joseph A. Santoro, Third–Party Plaintiffs,

v.

William Bartlett Jones, Lynn F. Payne, Kenan Transport Company, Inc., Central Oil Dispatchers, Inc., and James H. Kennett, Third–Party Defendants.

No. Civ.A. 2:97cv884.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 6, 1999.

Craig P. Wittman, Office of the United States Attorney, Norfolk, VA, Lois J. Schiffer, Matthew W. Morrison, U.S. Department of Justice, Environment and Natural Resources Div.,Environmental Enforcement Section, Washington, DC, Beth A.M. Termini, Office of Regional Counsel, U.S. Environmental Protection Agency, Philadelphia, PA, for United States of America.

J. Gray Lawrence, Jr., Faggert & Frieden, P.C., Chesapeake, VA, Linda B. Popejoy, Anthony Mirenda, Foley, Hoag & Eliot, LLP, Washington, DC, Peter R. Ginsberg, Washington, DC, Christopher M. Kise, Tampa, FL, for Domestic Industries Corporation, John C. Santoro, Jr., Joseph A. Santoro, Domestic Industries of Virginia, Inc.

James Edward Short, Roy, Larsen, Romm & Lascara, Chesapeake, VA, for William Bartlett Jones.

William Bartlett Jones, Butner, NA, pro se.

Patrick Hugh O'Donnell, Kaufman & Canoles, PC, Norfolk, VA, for Lynn F. Payne.

Charles Franklin Midkiff, Steven H. Theisen, Michael Rigsby, Midkiff and Hiner, P.C., Richmond, VA, for Kenan Transport Company, Inc.

Robert L. Sondej, Chesapeake, VA, for Central Oil Dispatchers, Inc.

Melvin Jay Radin, Norfolk, VA, for James H. Kennett.

## ORDER AND OPINION

FRIEDMAN, District Judge.

This matter comes before the Court on (1) Domestic Industries, Inc.'s (DIC) and Joseph Santoro's motion for summary judgment, (2) the United States' Motion for Summary Judgment on the False Claims Act (FCA) claims, and its Motion for Summary Judgment on the Resource Conservation Recovery Act (RCRA) claims (as to Domestic Industries of Virginia, Inc. (DIVI) only), and finally, (3) the third-party defendants' Motions for Summary Judgment. Additionally before the Court is the United States' Motion in Limine to exclude the second affidavit of William Jones, one of the third-party defendants named in this matter, obtained by DIVI on June 2, 1998. Due to the nature of the scheduling in this case, at the time of the hearing many of the responsive pleadings had not been received by the Court. Therefore, while the Court entertained oral argument, it was not in the position to rule from the bench on the pending motions. For this and other reasons, the Court took the motions under advisement, and the trial date was changed from December 1, 1998, to February 1, 1999, with a final pre-trial conference scheduled for January 13.

*Factual History*

This case involves the sale of oil products under government and commercial contracts. The defendants, DIVI and DIC, and the two companies' owners and managers, John C. Santoro, and Joseph Santoro, sell and market fuel oil.

From 1990 until 1992, DIVI had a contract to supply and deliver Number 5 burner oil to several Department of Defense (DOD) and other federal customers, including the Yorktown Naval Weapons Station (Yorktown), under a Defense Logistics contract (DLA600–90–D–4473). U.S. Statement of Facts In Support of Summary Judgment at ¶¶ 10–16 (hereinafter U.S. Facts). During the same time, DIVI also supplied heating fuel oil to the DOD under a subcontract. *Id.* William Bartlett Jones (a.k.a.Buddy) (a third-party defendant in this matter) was the sales manager for DIVI during the time of the said contracts, and was responsible for, among other things, quality assurance. John C. Santoro, an owner of and the CEO of DIVI, directly managed Jones' activities. U.S. Facts at ¶¶ 1–10.

In June 1990, Jones agreed with James Kennett, president of Central Oil Dispatchers (Central), that Central would obtain oil products, and re-sell the products to DIVI for delivery under the DOD and commercial contracts. U.S. Facts at ¶¶ 17–22; *see also* Defs' Answer at ¶¶ 22–24. These products included used and waste oil. *Id.*[1] Central obtained the used and waste oil at several cents per gallon and then sold the oil to DIVI at an inflated price. However, the price paid by DIVI was nevertheless less than the market value for the oil required under the con-

---

1. There is some controversy surrounding the first affidavit (elicited by United States), second affidavit (elicited by defendants) and third affidavit (elicited by the United States) of third-party defendant Jones. Jones is presently incarcerated for violations of the Anti–Kickback Act, for which he plead guilty in this Court and received forty-one (41) months imprisonment. Both the plaintiffs and the defendants allege that the affidavits were wrongfully obtained. The affidavits are contradictory on some major issues in the case. One explanation for the contradiction is contained in Jones' most recent affidavit where he claims that the second affidavit contained wrong information, but that he was under the impres-

sion that it could be changed at a later date. Based on this contradiction and Jones' explanation, the United States has filed a motion in limine to strike the second affidavit. For this reason, the Court will not in any instance rely solely on the information contained in the Jones' affidavits for the purposes of deciding the pending summary judgment motions. However, in the Court's opinion the affidavits are still "fair game" for either party to use at the trial in this matter in an attempt to impeach Jones, or for other relevant reasons. Therefore, the United States' Motion in Limine to exclude the second affidavit is DENIED.

tracts. *Id.; see also,* Affidavit of Carroll Moore of Moore's Waste Oil Services; Affidavit of Tom Moore of Moore's Waste Oil; Defs' Answer at ¶¶ 24–25. The difference in the price was reportedly distributed to several people as "kickbacks." *Id.* The DOD and commercial customers of DIVI paid market prices for the oil. *Id.; see also* Affidavit of Lynne Payne. While some of the oil provided by Central was from legitimate sources of new virgin oil, the oil was regularly mixed with used oil obtained from sources such as Moore's Waste Oil Service (Moore's Oil).

Moore's Oil, another of DIVI's suppliers, collected used oil from places, such as service stations and auto repair shops, and supplied the oil to DIVI. *See* U.S. Facts at ¶¶ 23–29; *see also* Affidavits of Thomas and Carroll Moore; and Statement of Facts from *United States v. Moore,* Case No. 2:96cr183 (E.D.Va.). Moore's Oil claims that it disguised the sale of the used oil by preparing invoices for "truck services," rather than used oil. *Id.* Moore's Oil did not perform any analyses of the oil. *Id.* Instead, Moore's Oil sold thousands of gallons of its· oil to Central who in turn sold part of the oil to DIVI. DIVI ultimately delivered the oil to the DOD under the DOD/DIVI contracts and to other commercial customers. U.S. Facts ¶¶ 17–43. Moore's Oil delivered the used oil to various locations owned and operated by DIVI, including the "large tank" located at DIVI's Lee Hall, Virginia facility. U.S. Facts at ¶ 28. As with the dealings outlined above with Central, the difference in the prices paid by DIVI and Moore's Oil was distributed as kickbacks to various individuals, including Jones.[2] *Id.*

While the prices paid by DIVI were inflated over what Moore's Oil paid, DIVI nevertheless paid less than the expected price of the type of oil required under the DOD contracts. U.S. Facts at ¶¶ 44–45; *see also* Deposition of Joseph Santoro at 109; Deposition of Lynn Payne (third-party defendant). As a result of these dealings, DIVI saw a forty-five to fifty-five percent savings from what it might have expected to pay at market value, and profit margins of twenty-five to forty-five percent. *Id.* For example, according to the United States' allegations, DIVI's dealings with Moore's Oil and others reportedly amounted to profits of approximately $1,500.00 to $3,500.00 per load, rather than the expected profit range of $150.00 per load. *Id.*

Similarly, DIVI obtained oil from Tank Cleaning Services—a company that drains oil from ships while at sea and stores the used oil until it can be disposed of,. commonly known as "slop oil." U.S. Facts ¶¶ 30–33; *see also* Defendant Admissions Nos. 4(j) and 54; Defendant Interrogatory Answer No. 14; and various affidavits and depositions. However, at least on one occasion, the paperwork for the transactions between DIVI and Tank Cleaning Services was modified to deceive Yorktown to believe that the oil came from another company, Sprague Oil, rather than from Tank Cleaning Services. U.S. Facts at ¶ 33.

Kenan Transport was the main company that DIVI used to transport its black oil products. U.S. Facts at ¶¶ 34–43; *see also,* Defendant Admission Nos. 4(a), 4(e), 4(f), & 31, and numerous supporting depositions and affidavits included in U.S. Exs. The oil Kenan delivered to DIVI included used and waste oil from Tank Cleaning Services, Moore's Oil and others. Kenan regularly mixed used and new oil, and then delivered it to DIVI. *Id.* Lynne Payne, a third-party defendant, was the terminal manager at Kenan. Either Jones or Payne would direct the drivers where to get the oil for DIVI. According to the United States, the delivery tickets given to DIVI's customers, including the DOD, allegedly misrepresented the source, type and volume of the oil. *Id.*

As a result of the type of oil delivered by DIVI, Yorktown's oil pumps seized, and shut down. U.S. Facts at ¶¶ 57–74 (citing numerous affidavits and John Santoro's Interrogatory Response No.16). Additionally, Yorktown began cleaning its oil strainers three times per day, rather than once a week, and a full time employee had to be assigned to work on the oil pumps. *Id.* The oil delivered was reportedly gritty and smelly, and often

---

2. Lynn Payne, formerly of Kenan Transport Company, and Jones were both prosecuted and plead guilty for their roles in the conspiracy to obtain used oil products for delivery to DIVI's customers.

contained used seals and gaskets, like those used in automobiles. *Id.* Yorktown began filtering all oil delivered by DIVI, and rejected several oil deliveries due to the visible impurities in the oil. *Id.*

According to the depositions of John Santoro and Lynne Payne, DIVI stored its "black" oil in two primary locations—Tank 220 at the Lee Hall facility, and certain trailers in Kenan's Chesapeake facility. U.S. Facts at 75–80. The oil contained in Tank 220 included used oil received from Moore's Used Oil Services. *Id.; see also* Defs' Interrogatory Answer No. 14, and various affidavits and depositions including May 1998 Affidavit of John Perry (Kenan employee and eye witness to oil delivery to Tank 220 and delivery from 220 to Yorktown). Central and Tank Cleaning Services also delivered oil to DIVI at Tank 220. U.S. Facts at ¶ 77.

In March 1993, DIVI, at the direction of John Santoro, tested the oil contained in Tank 220. U.S. Facts at ¶¶ 90–95. The test results indicated that the oil contained in Tank 220 contained greater than 1,000 parts per million (ppm) halogens. U.S. Facts ¶¶ 90–95; *see also* Deposition of John Santoro, Defendant Admission Nos. 59 and 60. After determining the amount of halogens contained in Tank 220, a decision was made to mix the oil with another type of oil. *Id.* After mixing the Tank 220 oil, DIVI sold the oil to Huntsville Chemical and Nash County Hospital. *Id.*

### Procedural History

In September 1997, the United States commenced this litigation by filing its initial complaint alleging that the named defendants purposefully substituted a lesser grade of oil for the products required under the contract specifications, and that DIVI charged the DOD for the higher grade and for more products than were actually delivered. The complaint has been amended two times since the initial filing. The United States filed its final allegations in a second amended complaint in March 1998. The second amended complaint alleges three claims under the FCA, 31 U.S.C. §§ 3729–3733, a claim for common law fraud, and six claims under the RCRA, 42 U.S.C. § 6928(a), (g), for violations of the EPA's oil management requirements, formerly set forth at 40 C.F.R. Part 266, Subpart E. *See* Second Amended Complaint

(March 17, 1998). In sum, the United States seeks approximately $3,500,000.00 in damages under the FCA, as well as $25,000.00 per day for each violation of RCRA. *Id.*

### Standard of Review

The standard for granting summary judgment is met if after a review of all of the pleadings, depositions, affidavits and other documents submitted by the parties, the court finds that there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Roe v. Doe*, 28 F.3d 404, 406 (4th Cir.1994). In this case, the plaintiff, two of the defendants (Joseph Santoro and DIC), and all of the third-party defendants (save Jones, who is not represented by counsel), have all filed motions for summary judgment and contend that there are no genuine disputes as to material facts, and that the law favors disposition of this case as a matter of law in each of the movant's favor.

To find against the movants, the Court must find both that the facts in dispute are material and that the disputed issues are genuine. As for materiality, the factual dispute must be dispositive of the claim. *See Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995). Similarly, the genuineness of the factual dispute must be more than a dispute based on speculation or inference. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (finding *inter alia* that a complete failure of proof on an essential element of the claim may render the facts immaterial); *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir.1997). Since the movants have each addressed different legal arguments, the pending motions will be addressed separately and in turn.

### The United States' Motions for Summary Judgment Against John Santoro and DIVI

#### I. The False Claims Act

The FCA, 31 U.S.C. §§ 3729–3733, constitutes seven acts, each creating a separate ground for liability. The United States claims that three of the provisions of the

FCA are relevant to the facts in this case, and as a matter of law impose liability on DIVI and John C. Santoro. The alleged relevant provisions apply to any person who:

(1) knowingly presents or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the Government, or

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a)(1–3).

■ The term person applies to persons and corporations, and respondeat superior applies to claims made under the FCA. *See* 1 U.S.C. § 1 (1988); *United States v. United States Cartridge Co.*, 198 F.2d 456 (8th Cir. 1952), *cert. denied*, 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345 (1953). An employer cannot defend against an FCA claim by merely showing that its employee committed fraud against the corporation as well as the government. *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929). Additionally, there is no requirement under the FCA that the principle or employer receive a benefit from the employee's fraud. *National Acceptance Co. of America v. Coal Producers Ass'n, Inc.*, 604 F.2d 540 (7th Cir.1979).

A. *Whether Jones Acted Within the Scope of His Employment*

■ The United States claims that summary judgment should be granted on its FCA claims since there are no material facts in dispute. The Court has reviewed the facts alleged and disputed by the defendants, and finds that there are material facts in dispute that require resolution by a trier of fact, rather than as a matter of law.

First, the United States contends that since Jones was the sales-manager at DIVI and reported directly to John Santoro, they had a master servant relationship. This conclusion can be readily reached by the undisputed facts. However, once a master servant relationship is established, the burden shifts to the employer to show that the employee was not acting within the scope of his or her employment when he or she committed the alleged illegal acts. Both the Fourth Circuit and the state courts of Virginia take a "fairly broad view of the scope of employment." *Demartinez v. Drug Enforcement Admin.*, 111 F.3d 1148 (4th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997).[3] Generally, an act is within the scope of employment if it is "naturally incident to [the master's] business ... done while the servant was engaged upon the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account." *Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir.1994) (citation omitted). In fact, while expressly forbidden or even conscious criminal acts may be within the scope of employment, the focus of the inquiry is whether the employee is performing the duties of the employment. *See generally*, *Young v. Sheetz, Inc.*, 987 F.Supp. 496, 503–04 (W.D.Va.1997) (citing *Plummer v. Center Psychiatrists, Ltd.*, 252 Va. 233, 476 S.E.2d 172 (1996) and *Commercial Business Systems v. BellSouth*, 249 Va. 39, 453 S.E.2d 261 (1995) (both describing the haziness of the limits of employment and indicating a departure from the traditional approach of non-liability of employer for wilful or malicious acts of employee)).

Notwithstanding all of this, DIVI adamantly denies that Jones was acting within the scope of his employment. DIVI claims that Jones was wholly motivated by personal profit, and that whether Jones was or was not within the scope of his employment is a

---

**3.** The Fourth Circuit in *Demartinez* found that the scope of employment under the Westfall Act should be decided by the District Court as a matter of law. The precise holding from *Demartinez*, however, is not applicable in this case since *Demartinez* dealt specifically with the Westfall Act, not the FCA. 111 F.3d at 1152. The Westfall Act, together with the Federal Tort Claims Act, make clear that a party is not entitled to a jury on the scope of employment question. *Id.* at 1152–53. (Citations omitted). The Court is unaware of any similar statutory instruction in the FCA.

factual dispute likely requiring a credibility determination to be made by the fact finder—in this case, the jury. Conversely, the United States argues that whether the defendant was acting within the scope of his employment should be decided as a matter of law. Based on the facts and circumstances of this case, including Jones' contradictory affidavits discussed *supra*, the Court agrees with DIVI that whether Jones was acting within the scope of his employment is a question best left for resolution at trial. *See Young*, 987 F.Supp. at 503 (citing *Plummer*, 476 S.E.2d at 173 (finding that summary judgment should rarely be granted on the issue of respondeat superior)). However, the Court acknowledges that the government's evidence on this issue is very persuasive. *See, e.g.,* U.S. Facts ¶¶ 5, 7, and 32. As a result, depending on what evidence is adduced at trial, the Court does not foreclose the possibility of resolution of this issue as a matter of law during the course of the trial.

### B. *Whether the Defendants Knowingly Submitted False Claims*

 Additionally, aside from whether Jones' actions were within the scope of his employment and imputable to the defendants,[4] a question of fact exists as to whether the defendants "knowingly submitted false claims or caused false claims to be submitted" to the United States. The FCA, 31 U.S.C. § 3729(b), defines "knowing" as when a person:

(1) has actual knowledge of the information,

(2) acts in deliberate ignorance of the truth or falsity of the information, or

(3) acts in reckless disregard of the truth or falsity of the information.

*Id.* The United States is not required to prove specific intent in a FCA claim. *Id.; see also United States v. Entin*, 750 F.Supp. 512, 518–19 (S.D.Fla.1990).

It is undisputed that the terms of the DIVI/DOD contract required that the oil delivered to DOD (1) meet the ASTM standards for # 5 light fuel oil, and (2) if the products were "blended," they were required to be "mechanically blended." U.S. Facts at ¶¶ 12 & 17; *see also* Perry Affidavit. There is also undisputed evidence that Jones, Domestic's sales manager to whom it trusted major decisions, had actual knowledge of the fact that the products provided under the DOD contract failed to meet the contract specifications, and that the actual amounts delivered were less than the amounts that the DIVI claimed. *See generally* U.S. Facts. (Jones plead guilty to scheme under Anti–Kickback Act). However, the question remains whether John Santoro and DIVI were aware of, or should have been aware of Jones' illegal activities. While the Court notes the broad definition of knowledge from the FCA, the factual dispute as to the defendants' knowledge in this case is more pronounced due to the questionable nature of the Jones' affidavits on which both the government and the defendants heavily rely.

Aside from knowledge of the activities through Jones' actions, the United States additionally claims that John Santoro had direct knowledge of everything that Jones did for DIVI, including the illegal used-oil scheme. Specifically, it contends that John Santoro, as the CEO of DIVI who was aware of the day-to day operations, *see* Deposition of John Santoro, knew or should have known that the claims presented to the DOD were false because he knew that the companies who provided the oil to DIVI were in the business of supplying used oil. Similarly, the United States claims that Santoro knew that the profits made by DIVI were markedly higher that expected. *See* Santoro Deposition at 109 (attached as U.S.'s Ex. 5 to Reply to MSJ); *see also* Ex. 3 (attached to US's

---

4. Courts outside the Fourth Circuit have held that an employer's alleged ignorance of an employee's false statements to the government is no defense to a FCA claim, and the employee's conduct will be imputed to the employer. *See, e.g., Entin*, 750 F.Supp. at 519 (finding that where employee was acting for benefit of employer, illegal acts were imputable to employer even if employer was unaware of illegal activity) (citing *United States v. DiBona*, 614 F.Supp. 40, 44 (E.D.Pa.1984) (same)). This Court declines to address the issue of whether Jones' actions, if within the scope of his employment, are imputable to DIVI regardless of its knowledge or if the scheme was purposefully hidden from DIVI. Instead, the question of scope of employment is specifically left to the finder of fact, the jury, which will be instructed on the law at the time of trial.

Reply Brief to MSJ); U.S. Facts at ¶ 33; *see also* Payne Depo. The United States also contends that Santoro knew that DIVI was paying considerably less than the market price for the oil, and that he knew that the oil was splash-blended, rather than mechanically blended. Even with this knowledge, the United States claims that Santoro and DIVI submitted claims to the United States for the oil as if it met the contract specifications. *Id.* Based on all of these allegations, the United States claims that Santoro and DIVI had direct and actual knowledge of the FCA violations.

However notwithstanding what appears to be overwhelming evidence to the contrary, John Santoro maintains that the oil product delivered to the DOD from DIVI met, and in fact exceeded the contract specifications. Alternatively, Santoro claims that neither he nor DIVI knew of any wrongdoing, and should not be held liable for Jones' actions. While difficult to believe of an executive officer of a corporation who purportedly ran a hands-on business, Santoro claims that he never personally read the contracts with the DOD, and therefore, was unaware of the exact contract specifications. Based on Santoro's claim of ignorance, the United States argues the FCA definition of knowledge through deliberate indifference or reckless disregard to information is applicable in this case, and that as a result, Santoro and DIVI are nonetheless liable under the FCA.

However, regardless of the apparent strength of the United States' case on the issue of DIVI's and Santoro's knowledge, the Court finds that there is a material question of fact as to a genuine issue of the FCA claims—whether either Santoro or DIVI actually knew or should have known that the claims submitted were false. For these reasons, summary judgment is inappropriate as to the FCA claims.

In sum, it is the Court's impression that the issues to be resolved at trial as to the FCA claims are as follows:

(1) Whether the claims submitted by the defendants to the United States were in fact "false;" and, either

(2) Whether Jones was acting within the scope of his employment when he carried out the alleged scheme to submit false claims to the United States; or

(3) Whether Santoro and DIVI knew or should have known that the claims presented to the United States were false, or both (2) and (3).

## II. *The RCRA Claims*

The United States additionally claims under RCRA (1) that DIVI marketed used oils as heating fuel to the DOD, in violation of the EPA's RCRA regulations, and (2) that DIVI illegally stored hazardous waste since it did not have RCRA permit. DIVI concedes that it did not comply with many or most of the RCRA regulations. However, it claims that it did not know that the oil it marketed to the DOD and others was used oil, or that any of its actions violated the RCRA standards. The United States argues that DIVI's ignorance, even if genuine, does not excuse its liability, and that since there are no material facts in dispute as to the RCRA claims pending against DIVI, summary judgment should be granted on Counts Five through Ten.

### A. *The Relevant Law Under RCRA*

RCRA establishes a framework for the management of solid and hazardous wastes designed to minimize threats to human health and the environment. 42 U.S.C. § 6901, *et seq.* RCRA, known as the cradle to grave statute for hazardous wastes, works hand-in-hand with the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) to provide a comprehensive framework for the production, transportation, storage, disposal, and clean-up of hazardous wastes.

The EPA is responsible for promulgating regulations to implement the provisions of RCRA. 42 U.S.C. § 6935(a). As such, in 1985, the EPA promulgated regulations establishing the standards for "used oil burned for energy recovery." 40 CFR Part 266, Subpart 5; 50 Fed.Reg. 49,164, 49,205 (Nov. 29, 1985).[5] "Used oil" is defined as any oil

---

**5.** Although the RCRA regulations were amended in 1993, 40 C.F.R. Part 279, the events at issue in this case occurred while the Part 266 regulations were in place, and therefore the prior regulations are applicable in this case. *See* 58 Fed.Reg. 26420 (May 3, 1993).

that has been refined from crude oil, used, and as a result of its use, is contaminated by physical and chemical impurities.[6] 42 U.S.C. § 6903(36); 40 C.F.R. § 266.40(b).

"Marketers" are persons or companies such as (1) generators who market used oil directly to a burner, (2) persons who received used oil from generators, and produce, process or blend oil from the used oils, and (3) persons who distribute, but do not directly process or blend the oil. Used oil is any oil that has been previously used, or is produced from used oil by processing, blending, or other treatment. 40 C.F.R. § 266.40(a).

Used oil is presumed "off specification" under RCRA unless a specific analysis is done to determine that the oil meets the specifications set forth in 40 C.F.R. § 266(e). 40 C.F.R. §§ 266.40(e), 266.43(a) & 266.43(b)(1); *see United States v. Eastern of New Jersey, Inc.*, 770 F.Supp. 964, 988 (D.N.J.1991). Specifically, the EPA's RCRA regulations provide that oil burned for energy recovery is presumed off-specification unless the marketer obtains an analysis or other information documenting that the used fuel oil does not exceed 5 parts per million (ppm) arsenic, 2 ppm cadmium, 10 ppm chromium, 100 ppm lead, 100 degrees F flash point, and 4000 ppm total halogens. 40 C.F.R. §§ 266.40(e) & 266.43(b)(1).

If used oil is "off specification," pursuant to the EPA's RCRA regulations, a marketer must take certain steps under the RCRA regulations. The regulations require in pertinent part that a marketer must:

(1) Market off specification oil for energy recovery only to: (a) burners or other marketers who have notified EPA of their used oil management activities, stating the location and general description, and EPA identification number; and (b) burners who burn the used oil in an industrial furnace or boiler of the type identified in 40 C.F.R. § 266.41(b). *See* 40 C.F.R. §§ 266.41(a), 266.43(b)(2);

(2) Notify EPA and provide the location and description of the used oil management activities. *See* 40 C.F.R. § 266.43(b)(3);

(3) Prepare and send the facility receiving its off-specification used oil fuel an invoice containing specific information including: invoice number, EPA ID number, names and addresses of shipping facilities, the quantity of used oil, the dates of shipment and delivery, the required certification statement that the used oil is subject to EPA regulation. *See* 40 C.F.R. § 266.43(b)(4);

(4) Obtain a one-time written and signed notice from the recipient burner prior to the first shipment certifying that the burner has notified EPA and that it will burn the fuel only in a proper burner. *See* 40 C.F.R. § 266.43(b)(5);

(5) Keep a copy of the invoice for three years from the date the invoice is received or prepared and keep a copy of each certificate notice received or sent for three years from the date the company engages in the oil burning or delivery. *See* 40 C.F.R. § 266.43(b)(6)(ii); and

(6) Maintain records of the used oil management activities, including analyses or other information documenting that the used oil meets the specifications contained in 40 C.F.R. Section 266.40(e) for a period of at least three years. *See* 40 C.F.R. §§ 266.43(b)(1), (3) & (6).

Additionally, if used oil contains more than 1000 parts per million (ppm) of halogens (an indication of the presence of waste in the oil), then it is presumed to be hazardous waste fuel and is subject to regulation under 40 C.F.R. 266, Subpart H. 40 C.F.R. § 266(40)(c). However, the presumption based on the amount if halogens can be overcome by an affirmative showing that the used oil was not adulterated with any hazardous spent solvents or other hazardous wastes. 40 C.F.R. § 266(40)(c); *Eastern of New Jersey*, 770 F.Supp. at 977–78. Additionally, the ppm halogen presumption triggers numerous other mandatory reporting requirements which, *inter alia*, prohibit a person from running a hazardous material facility without certain EPA issued permits.

---

6. Contaminates include lead from gasoline, other heavy metals, and chemical additives from automotive or industrial use. HR Rep. No. 96–1415.

42 U.S.C. § 6925(a); 40 C.F.R. § 266.34(c); 40 C.F.R. §§ 270.1(b) and 270.10(b).

Congress provided that persons violating the above-stated requirements contained in RCRA and its implementing regulations can be held liable for civil penalties of up to $25,000.00 per day for each violation. 42 U.S.C. §§ 6928(a) and (g). As such, the government seeks civil penalties under RCRA.

### B. Counts Five Through Nine—Violations of the RCRA Regulations for Used Oil

The United States' Counts Five through Nine, all under the RCRA regulations, depend on the Court's determination of several key facts. First, the Court must determine whether DIVI was a "marketer" of oil products. Second, the Court must determine whether the products marketed by DIVI were "used oil" or "off specification" as defined by RCRA. Third, the Court must determine whether the oil was used for energy recovery purposes. Finally, the Court must determine as a matter of law the validity of the various defenses raised by DIVI, including the lack of knowledge defense. If the Court finds for the United States on the above three matters, and discredits the defenses raised by DIVI, then as a matter of law, since DIVI does not contest the fact that it did not comply with any of the RCRA regulations applicable to marketers of used oil, the Court must find DIVI liable under RCRA.

### 1. Whether DIVI Was A Marketer

■ DIVI admits that it is in the business of marketing oil products, including oil that is burned for fuel. See DIVI Answer at ¶ 18; U.S. Facts at ¶ 14. DIVI also admits that it is a person as defined by RCRA. See DIVI's Admissions at ¶ 2. However, DIVI denies that it was a marketer of "used" oil products, as defined in RCRA. Instead, it contends that Moore's Oil and the other companies that sold oil to DIVI were marketers who deliberately disguised the oil sold to DIVI, and that DIVI had no knowledge that the oil it sold to either the United States or the other purchasers was used.

The regulations implementing RCRA define "marketers" of used oil simply as any company or person who markets used oil. 40

C.F.R. § 266.43(a). Based on the facts before the Court, the Court easily finds that DIVI is in the business of marketing oil. However, to apply the RCRA provisions and regulations advocated by the government in this case, the Court must determine whether the oil marketed by DIVI was used-oil, as defined by RCRA.

### 2. Whether The Oil Was "Used"

■ As set forth above, "used oil" includes oil that has been has been refined from crude oil, used, and as a result, is contaminated with physical or chemical impurities. 42 U.S.C. § 6903(36); 40 C.F.R. § 266.40(b). Used fuel oil not is not limited to oil that is burned for energy recovery, but also includes any fuel produced from used oil by processing, blending or some other treatment process. 40 C.F.R. § 266.40(a).

Although DIVI disputes this fact, the United States has presented overwhelming evidence that DIVI marketed used oil as heating fuel. See U.S. Facts §§ 17–18, 21–89. The United States' evidence that the oil marketed was "used" includes: (1) that DIVI received its oil from companies that admittedly sell used oil, such as Moore's Waste Oil, Kenan, and Tank Cleaning Services; (2) that the prices DIVI paid for the oil were considerably less than market value indicating that the oil was not new or virgin oil; (3) that the profits realized by DIVI were greater than what would be expected it marketed new oil; (4) that Yorktown sampled the oil provided by DIVI and found both physical and chemical impurities in the oil, indicative of used oil; (5) that trash and debris (physical impurities) were found in the oil delivered by DIVI to Yorktown; and (6) that the oil provided by DIVI created problems in the furnaces using the oil. See, e.g., U.S. Facts at ¶¶ 18–19, 23–45, 52–53, and 57–74. Further, numerous affidavits from the employees, transporters, suppliers and customers of DIVI confirm that the oil marketed by DIVI was "used oil." See U.S. Facts at ¶ 23; see also Affidavits of Carroll Moore, Thomas Moore, Gerald Weaver, and Lynn Payne.

DIVI claims that question of fact exists as to whether the oil was "used," or what portion of the oil was used, or which loads of oil

were used. However, DIVI offers nothing to rebut the overwhelming evidence that the United States presented, aside from its unsubstantiated assertion that the oil was not used. DIVI's proclamation that the oil was not used does not suffice to present a genuine issue of material fact as to the RCRA claims. *See Runnebaum,* 123 F.3d at 164; *Eastern of New Jersey,* 770 F.Supp. at 988 (granting summary judgment under RCRA over defendant's assertion that it did not store hazardous waste when defendant produced no evidence to prove its assertion).

■ Apparently in the alternative, DIVI argues that under the RCRA regulations it is exempt since it was not the "first person" to market the oil at issue in this case. *See* 40 C.F.R. §§ 266.40(e), 266.43(a)(2). The RCRA regulations provide, *inter alia,* that a person is a not a "marketer" if it is not the first person to claim that the oil meets the specifications. 40 C.F.R. § 266.43(a)(2). Relying on this exception to the marketing rules, DIVI claims that Moore's Oil and the parties supplying oil to DIVI are the actual "marketers of used oil" under RCRA. However, DIVI knew that neither it nor any of the its suppliers tested the oil at issue in this case to determine whether the oil met the RCRA specifications. U.S. Facts at ¶¶ 95 & 100. Furthermore, DIVI has not offered any documentary proof that Moore's Oil or any of the other suppliers were in fact the "first person," as described under the regulations. *See* 40 C.F.R. §§ 266.43(b)(1), 266.43(b)(6) (requiring three years documentation that oil meets specifications). Therefore, the Court finds that the "first person" exception to the marketing requirements does not apply in this case.

■ Because RCRA does not contain a provision excusing a marketer if a certain percentage of the oil marketed is new and a lesser percentage is used, and it contains no minimum requirements, then if any of the oil marketed by DIVI was used, DIVI is subject to RCRA provisions for used-oil.[7] The Unit-

ed States has presented overwhelming and convincing evidence that at least some portion of the oil marketed and delivered by DIVI was actually used, or splash blended, either of which qualifies the oil as "used oil" under RCRA and its regulations.

### 3. The Lack of Knowledge Defense

■ DIVI's primary defense to the United States' RCRA claims is that it did not have knowledge either of Jones' involvement in the alleged used-oil scheme, or of the fact that the oil it sold to the DOD and other commercial purchasers was either used or hazardous. However, unlike the availability of an ignorance defense under the FCA, *see supra* discussion, whether DIVI knew of the alleged illegal RCRA activities occurring at its facilities is immaterial based on many courts' rulings that RCRA provides for strict liability.[8] *See United States v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 810 F.2d 726, 737–38, 741 (8th Cir.1986) (noting that Section 7003 of RCRA imposes strict liability upon past off-site generators of hazardous waste and upon past transporters of hazardous waste); *United States v. Valentine,* 885 F.Supp. 1506, 1511 (D.Wyo.1995) (finding that RCRA imposes strict liability); *Zands v. Nelson,* 797 F.Supp. 805, 816 (S.D.Cal.1992) (finding that the owner/operator "is no less culpable than that negligent actor under RCRA's strict liability scheme"); *United States v. Production Plated Plastics, Inc.,* 742 F.Supp. 956, 960 (W.D.Mich.1990) (finding that RCRA was a "remedial strict liability statute" to be liberally construed), *aff'd* 955 F.2d 45 (6th Cir.1992) (unpublished, table decision), *cert. denied* 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992); *United States v. Allegan Metal Finishing Co.,* 696 F.Supp. 275, 28, 295 (W.D.Mich.1988) (finding that RCRA is a strict liability statute); *see also United States v. Aceto Agricultural Chem. Corp.,* 872 F.2d 1373 (8th Cir.1989) (finding generally that RCRA should be liberally con-

7. The defendants will have the opportunity to argue the degree of its culpability, *i.e.,* the amount of the oil used verses new, at the stage of the litigation when and if civil penalties are imposed by the Court.

8. Likewise, it is not a defense to argue that compliance with the RCRA regulations was impossible. *See, e.g., United States v. Envt'l Waste Control, Inc.,* 710 F.Supp. 1172, 1212 (N.D.Ind. 1989), *aff'd* 917 F.2d 327 (7th Cir.1990), *cert. denied,* 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

strued); *Western Greenhouses v. United States,* 878 F.Supp. 917, 930 (N.D.Tex.1995) (noting in dicta that RCRA and CERCLA are both strict liability statutes); *United States v. Liviola,* 605 F.Supp. 96, 100 (N.D.Ohio 1985) (concluding that wilful intent is only necessary for a finding of criminal liability under RCRA); *cf.* 42 U.S.C. § 6928(d) & (e) (providing for criminal penalties only where knowledge is specifically proven, rather than strict liability); *but see Leister v. Black and Decker (U.S.), Inc.,* 117 F.3d 1414, 1997 WL 378046, *2 (4th Cir.1997) (unpublished) (affirming district court's grant of summary judgment for RCRA claim and interpreting RCRA's citizen suit provision to require plaintiff to prove an "imminent and substantial endangerment to health or environment," *i.e.,* rather than strict liability).[9]

As the Supreme Court noted in *Liporata v. United States,* 471 U.S. 419, 433, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), statutes designed to protect the public health and welfare are more likely candidates for diminished mens rea requirements. RCRA and other similar environmental protection statutes fall within this category. Like the numerous courts cited above, this Court finds that the RCRA provisions at issue in this case provide for strict liability, and therefore, the defen-

dants' knowledge, or lack thereof, is immaterial.[10]

### 4. The Off-Specification Presumption For Marketed Used Oil

■ As set forth above, when oil is "used," as defined under RCRA, it is presumed to be "off-specification" from the RCRA requirements unless it is specifically tested and proven to meet the RCRA specifications.[11] 40 C.F.R. §§ 266.40(e), and 266.43(b)(1).

DIVI essentially admits that it never obtained any analyses of the oil it delivered to the United States or other purchasers. Therefore, DIVI cannot affirmatively demonstrate that the oil it delivered met the EPA RCRA specifications. *See Eastern of New Jersey,* 770 F.Supp. at 977–78. Instead, without argument as to why or specific proof, DIVI simply claims that the United States is not entitled to the off specification presumption contained in RCRA for used oil. Having no basis to find otherwise, the Court is willing to accept the RCRA presumption that the oil delivered and marketed by DIVI was "off-specification" of RCRA standards.

Therefore, based on the facts in this case, DIVI became a marketer of off-specification used oil on any occasion on which it either received or shipped, or arranged for the ship-

9. The Court acknowledges the Fourth Circuit's recent unpublished *Leister* opinion which implies that RCRA is not a strict liability statute. *Leister v. Black and Decker (U.S.), Inc.,* 117 F.3d 1414, 1997 WL 378046, *2 (4th Cir.1997) (unpublished). However, the Court reads the *Leister* case narrowly as applying only to citizen suits brought under RCRA's Section 6972(a)(1)(B), and not as to actions, such as this, brought by the United States to enforce the various provisions of RCRA under 42 U.S.C. § 6928(a). *See* 42 U.S.C. § 6928(g) (providing civil penalties against any person "who violates" RCRA provisions). Furthermore, notably in this case, unlike in *Leister,* the defendants have not challenged the United States' right to bring this suit based on a lack of an imminent and substantial endangerment to the health and environment.

10. The United States also argues that DIVI should be found liable under the theory of respondeat superior for the actions of William (Buddy) Jones, whom the United States claims was acting within the scope of his employment. As it did with regard to the FCA claims, DIVI argues that Jones acted for his own benefit and

disguised the sale of the used oil from DIVI. Therefore, DIVI claims that Jones acted outside the scope of his employment and that it should not be held liable for his actions. Since the Court does not accept the lack of knowledge defense asserted by DIVI for the RCRA claims, and finds that DIVI is directly liable for the RCRA violations under the theory of strict liability, it need not address whether a DIVI is also liable under the theory of respondeat superior. However, arguments such as respondeat superior and the defendants' liability for Jones' actions, as well as the defendants' knowledge or lack thereof of Jones' actions, or other similar mitigating factors may be relevant at the penalty stage of these proceedings. *See Envt'l Waste Control,* 710 F.Supp. at 1212; *United States v. Bethlehem Steel Corp.,* 829 F.Supp. 1023, 1027–28, 1045 (N.D.Ind.1993); *aff'd in part* 38 F.3d 862 (7th Cir.1994).

11. RCRA does not require that the marketer, in this case DIVI, actually send the off-specification oil directly from its facility. *See Eastern of New Jersey,* 770 F.Supp. at 988 (finding that it was not fatal to claim that Eastern had not shipped oil directly from its facility).

ment of used oil from companies such as Moore's Waste Oil, Central, Tank Cleaning Services, Dirty Works, or any other sources which supplied used oil to DIVI.

### 5. *Whether the Oil Was Used for Energy Recovery*

Finally, the Court finds that there is no genuine dispute as to the fact that the oil marketed by DIVI was intended for and used for heating purposes, *i.e.*, energy recovery. *See* DIVI Admission No. 17.

### 6. *Whether DIVI Met the RCRA Requirements for Used Oil*

There is also no dispute that DIVI never attempted to meet the requirements for marketers of used oil. Instead, as explained and specifically rejected above, DIVI contends either that the oil was not used, or that if it was used, that DIVI had no knowledge that it was used.

Based on DIVI's concession that it did not comply with the RCRA regulations for marketers of used oil, and the Court's factual findings set forth above, summary judgment is appropriate as to Counts Five through Nine pending under RCRA against DIVI. While DIVI identifies what it contends are genuine issues of material facts as to the RCRA claims, the Court finds that none of the identified "disputed facts" are material. *See Thompson,* 57 F.3d at 1323. Instead, the Court is of the opinion that any rational trier of fact after listening to the evidence produced by the United States in support of its RCRA claims against DIVI, and being advised on the law, including RCRA's strict liability and the standards regarding "used oil," could only come to one conclusion—that DIVI is liable under RCRA as described in the United States' Counts Five through Nine.

### C. *Count Ten—Violation of the RCRA Standards for Operating A Hazardous Waste Treatment, Storage and Disposal Facility*

In addition to the used oil regulations set forth above, the United States also claims that DIVI is liability under the hazardous waste provisions of RCRA, which provide that a person may not own or operate a hazardous waste treatment, storage or dis-

posal facility unless it has a permit to do so, or has received an "interim status permit" from the EPA. 42 U.S.C. §§ 6925; 40 C.F.R. § 270.1(b). To establish a violation of these requirements, the United States must show

(1) that DIVI stored, treated or disposed of materials containing hazardous wastes;

(2) that DIVI was the owner or operator of the facility that stored, treated or disposed of the hazardous waste; and

(3) that DIVI did not have a permit or obtain an "interim status permit" to store, treat, or dispose of the hazardous waste.

*Id.* Like RCRA's used-oil provisions cited above, there is no explicit knowledge requirement for liability under this section of RCRA. *See supra* case law regarding knowledge requirement; *cf. United States v. Self,* 2 F.3d 1071 (10th Cir.1993) (finding that even in a criminal prosecution for transporting and storing hazardous waste without a permit, it was unnecessary to prove that defendant knew the hazardous substance was defined as hazardous waste by the EPA, when the United States could prove that the defendant knew the general hazardous nature of the substance).

The United States moves for summary judgment on Count Ten arguing that there are no material facts in dispute. There is no dispute that DIVI is the owner/operator of Tank 220 located at it's facility at Lee Hall, Virginia. U.S. Facts at ¶ 92. Additionally, there is no dispute as to whether DIVI had a permit to store, treat or dispose of hazardous waste. It did not. U.S. Facts at ¶ 110; DIVI Admission at Nos. 61–62. Therefore, the Court's inquiry focuses on the second requirement—whether the facility owned or operated by DIVI stored, treated or disposed of hazardous waste.

Based on an analytical study instigated by DIVI and John Santoro, oil taken in March 1993 from DIVI's Tank 220 located at its Lee Hall, Virginia, facility contained elevated levels of total halogens—greater than 1,000 ppm of total halogens. "Used oil containing more than 1,000 ppm total halogens is presumed to be hazardous waste," pursuant to the RCRA regulations. 40 C.F.R. § 266.40(c). DIVI has not presented any evidence to overcome

the RCRA presumption of hazardous waste. Instead, DIVI admits owning and operating Tank 220, *see* U.S. Facts at ¶ 108 (citing DIVI Admission No. 58), but, contends that its attempts to reduce the possibility of hazardous waste by diluting the fuel with number 2 fuel oil excuses liability.[12] *See* U.S. Facts at ¶ 92. However, as a matter of law, mixing fuels does not change the characterization of a hazardous waste. 40 C.F.R. § 261.3(a)(2)(iii)–(v).

Therefore, the Court finds as a matter of law that DIVI owned and operated Tank 220, in which it, at least at one point, stored hazardous waste (greater than 1000 ppm of total halogens). By its own admission, DIVI did not comply with the RCRA regulatory procedures for storage of hazardous wastes. Therefore, DIVI violated the RCRA standards and regulations for storage of hazardous wastes, and summary judgment is appropriate as to plaintiff's Count Ten.

### D. Result of Violations of the RCRA Regulations for Used Oil

Civil penalties under RCRA are assessed by the Court and can amount to as much as $25,000.00 per day per violation. 42 U.S.C. § 6928(g). The Court will determine the appropriate penalty for DIVI's RCRA violations at a later date following the resolution of the remaining claims in this case, and after the benefit of additional evidence and argument on the appropriate RCRA penalty. Until that time, the following issues remain for resolution as to Counts Five through Ten: (1) whether John Santoro is liable for violations of the RCRA claims; and (2) what penalties, if any, are appropriate as to DIVI, and if he is found liable, as to John Santoro.

### Domestic Industries Corp.'s and Joseph Santoro's Motions for Summary Judgment

Joseph Santoro (brother of John Santoro) and DIC are named by the United States as defendants with regard to the FCA claims. Joseph Santoro and DIC previously moved this Court for dismissal based on failure to state a claim. However, the motion was denied. Now, they move for summary judgment arguing that their connection to the alleged illegal conduct is too tenuous to base a claim under the FCA, and that the facts do not show that they had any knowledge of what was occurring between John Santoro and DIVI.

Joseph Santoro is the President of DIC, a holding company based in Rhode Island. During the time of the alleged illegal conduct outlined in the United States' complaint, DIVI was a wholly own subsidiary of DIC.[13] While Joseph Santoro claims that his involvement with DIVI was minimal, the United States claims that his conduct and connection to DIVI imposes liability against both him and DIC under the FCA.

Specifically, the United States claims that Santoro and DIC took some part in the allegedly deceptive claims submitted by DIVI. Joseph Santoro admits that he sometimes served as an officer of DIVI, and that on occasion he filled in for his brother John Santoro, the CEO of DIVI. *See* Deposition of Joseph Santoro at 28–29, & 333–34. However, Santoro denies any control or connection to the daily operations of DIVI. *Id.*

The United States opposes the defendants' motion for summary judgment relying on what it contends are material issues of genuine fact in dispute as to Joseph Santoro's and DIC's knowledge, or deliberate lack of knowledge, and involvement with the daily operations at DIVI and its alleged scheme to deliver off specification oil to the United States. As set forth above, knowledge is broadly defined under the FCA.

Based on the facts before the Court, the Court cannot say as a matter of law that Joseph Santoro and DIC did not violate the FCA.[14] Therefore, for the same reasons that

---

**12.** DIVI also admits that it sold the mixture of fuel contained in Tank 220 to Nash County Hospital and Huntsville Chemicals. U.S. Facts at ¶ 92.

**13.** Apparently, DIVI and DIC were one company until this suit was filed by the United States, at which time, allegedly for reasons unrelated to this case, they separated. Joseph Santoro and DIC claim that they always intended to separate the companies for financial reasons. However, the United States argues that the corporate separation amounts to a concerted effort to shield certain assets from potential liability under the FCA. This also is an issue best left to the finder of fact in this case.

**14.** Many of the United States' allegations against Joseph Santoro are based on the statements of Buddy Jones. Joseph Santoro specifically denies

the United States' motion for summary judgment on the FCA claims as to John Santoro and DIVI was denied, so is summary judgment inappropriate as to Joseph Santoro and DIC.[15] The same issues outlined above as to the pending FCA claims against John Santoro and DIVI, must be resolved by a trier of fact as to Joseph Santoro and DIC.

### The Third–Party Defendants' Motions for Summary Judgment

The defendants' third-party complaint alleges thirteen counts against the DIVI's suppliers and individuals employed by the supplies for, *inter alia,* fraud, negligent misrepresentation, breach of contract, civil conspiracy, indemnity, and contribution. The third-party defendants seek summary judgment on all claims.[16] Alternatively, they argue that at least the indemnity and contribution claims (Counts 13 and 14, *see* Amd. Third–Party Complaint at ¶¶ 149–153) of the third-party complaint fail to state a claim under federal law, and that if these federal claims are dismissed, the Court should decline to exercise jurisdiction of the remaining state claims.

### A. *The Federal Claims for Contribution and Indemnity for RCRA Penalties*

■ A party claiming a right under federal law can avoid dismissal, unless the claim is "facially insubstantial or frivolous, and even a non-frivolous claim that a remedy may be implied from a federal statute will suffice." *Ridenour v. Andrews Federal Credit Union, et al.,* 897 F.2d 715, 719 (4th Cir.1990) (citation omitted). "The existence of a such a claim is of course a predicate for the existence of federal jurisdiction over it." *Id.* (citing *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). Therefore, if

the third-party plaintiffs are entitled to indemnity or contribution from the third-party defendants based on the United States' RCRA claims, then the third-party complaint is viable. If not, at least the federal claims must be dismissed as a matter of law.

■ The United States alleges that the defendants are in violation of various sections of RCRA, and the defendants contend that if they are in violation of RCRA, then the third-party defendants are liable for, among other things, contribution and indemnity. The third-party defendants claim that indemnity and contribution are not actionable as a matter of law since RCRA does not specifically provide for either indemnity or contribution.

The Court turns first to the Supreme Court's decision in *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996), where the Court distinguished RCRA from CERCLA noting that RCRA was not "clean-up" statute. While RCRA provides for private causes of action to stop polluters injunctively through its citizen suit provisions, *see* 42 U.S.C. § 6972(a)(1)(A), in CERCLA, Congress specifically provided for remedies such as contribution and indemnity. *Id.* The Court held that citizens cannot maintain private suits under RCRA for "past" clean-up costs. *Meghrig,* 516 U.S. at 485–85, 116 S.Ct. 1251. Admittedly, the Supreme Court did not expressly address the issue presented in this case—whether a private party can recover through a contribution or indemnity action for civil penalties or clean-up costs for land that has not yet been cleaned.

However, prior to the Supreme Court's decision in *Meghrig,* the Eighth Circuit in

---

the statements made by Jones, including whether Joseph Santoro participated in a private meeting between Jones and another person to discuss prices and arrangements for the purchase and delivery of the off-specification oil. As set forth above, Jones' previous statements in this case are somewhat contradictory. Therefore, reliance on his testimony for these issues, if appropriate, is best left to the trier of fact.

**15.** The United States apparently recognized the disputed material facts with regard to Joseph Santoro and DIC, since its motion for summary judgment for the FCA only applied to John C. Santoro and DIVI.

**16.** The third-party plaintiffs object to the procedures followed by all of the third-party defendants except Kenan. Specifically, Kenan filed a motion for summary judgment based on the arguments set forth herein. Thereafter, each of the other named third-party defendants filed motions joining in the legal argument set forth by Kenan. The third-party plaintiff then filed duplicative opposition memoranda to respond to each of the motions. This Court excuses any procedural error potentially assignable to the third-party defendants, and finds that the third-party plaintiff was not prejudiced by filing duplicative response briefs to identical legal arguments.

*Furrer v. Brown,* 62 F.3d 1092 (8th Cir.1995), *cert. denied,* 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 667 (1996), squarely addressed the issue presented here. Specifically in *Furrer,* the Furrer's property was contaminated and they were ordered by the State to remediate the contamination. *Furrer,* 62 F.3d at 1093. The Furrer's sought, by way of a third-party complaint, to collect the costs of remediation from the previous owners and lessees. *Id.* The Eighth Circuit denied the Furrer's attempt to recover from the third-parties noting that it was ultimately a question of Congressional intent, and that there was no basis in the law for such an action. *Id.* at 1101–02 (citations omitted). While the Supreme Court did not specifically address the question presented here or in *Furrer,* the Court denied the request for certiorari in *Furrer,* and tacitly affirmed *Furrer* by resolving the conflict between the Eighth Circuit's decision in *Furrer* and the Ninth Circuit's decision in *Meghrig* with an unanimous reversal of the Ninth Circuit's *Meghrig* decision. *Meghrig,* 516 U.S. at 483, 116 S.Ct. 1251.

Additionally, at least one District Court has taken the position advocated by the third-party defendants. In *Davenport v. Neely,* 7 F.Supp.2d 1219 (M.D.Ala.1998), the district court dismissed the third-party plaintiff's attempt to implead third-party defendants. In a lengthy and well-reasoned opinion, the *Davenport* court held that the defendants did not have a right to indemnity and contribution under RCRA. *See also, Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609 (M.D.Pa.1997) (refusing to allow third-party recovery of future and current clean-up costs under RCRA).

The third-party plaintiffs in this case argue that both *Meghrig* and *Davenport* are distinguishable from the facts in this case because this case does not specifically involve liability for "clean-up" costs under RCRA. The third-party plaintiffs contend that the holdings from *Meghrig* and *Davenport* are limited to whether defendants sued in citizen suits under RCRA can bring contribution and indemnity actions against third-parties. This Court disagrees with third-party plaintiffs' narrow reading of *Davenport* and *Meghrig,* and finds that the difference between the cases is not remarkable, and does not change the underlying reasoning of the opinions. Instead, the significance of the holdings of both *Meghrig* and *Davenport,* is that a court should not impose a remedy where Congress specifically declined to allow the remedy. The same policies relied on by the previous courts are applicable in this case. *Davenport,* at 1227 (quoting *Furrer v. Brown,* 62 F.3d 1092 (8th Cir.1995)). In fact, the equity arguments set forth in *Davenport* and *Furrer* for prohibiting contribution and indemnity claims in RCRA cases are even more compelling in a case, such as this, where the remedy potentially awarded against the defendants is a civil penalty assessed by the Court, rather than compensatory damages for clean-up costs.[17]

Finally, the third-party defendants analogize that the Fourth Circuit's ruling in *Lyle v. Food Lion, Inc.,* 954 F.2d 984 (4th Cir. 1992), under the Fair Labor Standards Act (FLSA) should inform this Court's decision. *Lyle* involved a case brought under the FLSA where the defendant filed a third-party complaint in an attempt to transfer any potential liability under the FLSA to a third-party defendant. *Id.* at 987. The Fourth Circuit held that "to engraft an indemnity action upon this otherwise comprehensive federal statute would run afoul of the Supremacy Clause of the Constitution and would undermine employers' incentives to abide by the Act." *Id.* at 987 (citing *LeCompte v. Chrysler Credit Corp.,* 780 F.2d 1260, 1264 (5th Cir.1986)); *see also Mortgages, Inc. v. United States District Court for the District of Nevada,* 934 F.2d 209 (9th Cir.1991) (finding that counterclaims for contribution and indemnity under the FCA were not actionable).

**17.** Third-party plaintiffs rely heavily on *United States v. Valentine,* 856 F.Supp. 627, 632 (D.Wyo. 1994), where the Court specifically allowed a third-party claim similar to the one here finding that contribution and indemnity were applicable under RCRA. *Id.* at 630 (noting that to prohibit the claim for contribution and indemnity would "effectively immunize" the third-parties). However, the third-party plaintiffs ignore the fact that *Valentine* was decided in 1994, prior to the Supreme Court's 1996 decision in *Meghrig,* which, in this Court's opinion, resolved any previous doubt as to the nonapplicability of indemnity and contribution in cases under RCRA.

Similarly in this case, RCRA is nothing if it is not comprehensive. *See Meghrig*, 516 U.S. at 483, 116 S.Ct. 1251. As a result, this Court declines to "engraft" a contribution or indemnity action. "While such a result may seem inequitable ... 'remediation of contaminated property attaches, without regard to fault ...'" *Davenport*, 7 F.Supp.2d. at 1230 (citing *Furrer*, 62 F.3d at 1098–99). Accordingly, Counts 13 and 14 of the third-party complaint must be dismissed.[18]

### B. *Supplemental State Law Claims*

■ The remaining counts set forth in the third-party complaint are as follows: fraud (Count 1 (Jones only), Count 2 (Jones, Payne and Kenan), and Count 3 (Jones, Kennett, and Central Oil)); negligent misrepresentation (Count 4 (Jones Payne and Kenan) and Count 5 (Jones Kennett, and Central Oil)), implied duty of good faith and fair dealing and fiduciary duty (Count 6 (Jones only)), breach of contract (Count 7 (Payne and Kenan) and Count 8 (Kennett and Central Oil)), fraud (Count 9 (John Santoro v. Jones)), civil conspiracy (Count 10 (all third-party defendants), Count 11 (Jones, Payne, and Kenan) and Count 12 (Jones, Kennett, and Central Oil)). Each of these claims are supplemental state law claims. The third-party defendants ask that the Court exercise its discretion to dismiss the state claims from this case.

■ Title 28 Section 1367(c) provides that when the federal claims are dismissed from a case as a matter of law, the Court may decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 145 F.3d 660, 662 (4th Cir.1998) (denying attempts to establish pendent jurisdiction); *ESAB Group, Inc. v. Cen-tricut, Inc.*, 126 F.3d 617, 628 (4th Cir.1997) (acknowledging that pendent jurisdiction is discretionary and should be exercised only if in furtherance of judicial economy, convenience and fairness to litigants). The usual rule is where the federal claims are dismissed as a matter of law prior to trial, "even if not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. While the third-party defendants argue that the statute of limitations for the state claims has already run and as a result the state law claims are barred, the third-party plaintiffs have not expressed a fear of losing a right of action as a basis for retaining the state claims in this case, nor do they argue that as a matter of equity the claims should remain in this Court. *See Rosado v. Wyman*, 397 U.S. 397, 404–405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) (noting that matters such as statute of limitation problems and amount of time and resources expended should be considered prior to dismissing pendent state claims); *Ridenour*, 897 F.2d at 722.

Therefore, relying on the guidance from *Gibbs* and the subsequent Fourth Circuit case law, and its authority under 28 U.S.C. § 1367(c), this Court declines to exercise jurisdiction over the third-party claims under state law absent some viable federal claim. While the Court notes that RCRA specifically reserves any state remedies, *see* 42 U.S.C. § 6972(f), the Court also declines to exercise its jurisdiction to rule on the state law claims or to make any preliminary determinations as to the viability of the state claims based on statute of limitations or other legal arguments. *See Gibbs*, 383 U.S. at 715 & 726, 86 S.Ct. 1130. Instead, the state claims and their disputed viability are best left, if at all, to the capable state courts. *Id.* For these reasons, the state claims set forth in the third-party complaint are dismissed without prejudice.[19]

---

**18.** In addition to their claim that the statute of limitations bars many of the claims, the third-party defendants argue that indemnity is not applicable in this case since under Virginia law the party seeking indemnity must be blameless and indemnity is limited to neither express or implied indemnity, neither of which is applicable in this case. Similarly, the third-party defendants argue that contribution is inapplicable since this case is not based on negligence or moral turpitude. Because the Court finds as a matter of law that the defendants cannot claim indemnity or contribution in this case, it need not address these state law matters.

**19.** The Court is aware that the various third-party motions for summary judgment were filed on behalf of all third-party defendants except for Jones, who is presently a federal inmate unrepresented by counsel aside from his recently ap-

### CONCLUSION

For the reasons set forth above, the United States' Motion for Summary Judgment for the claims pending under the FCA is DENIED.

The United States' Motion for Summary Judgment for the claims pending under RCRA against DIVI is GRANTED.

Joseph Santoro's and DIC's Motion for Summary Judgment is DENIED.

Kenan's, Payne's, Central's, and Kennett's Motions for Summary Judgment are GRANTED with respect to Counts 13 and 14 of the third-party complaint, and the remaining state claims against the third-parties are DISMISSED without prejudice. Additionally for the same reasons as set forth as to other third-party defendants, the claims pending against third-party defendant William Bartlett Jones (Buddy) are DISMISSED without prejudice.

Finally, as set forth above in footnote 1, the United States' Motion in Limine to Exclude the Affidavit of William "Buddy" Jones Obtained by Domestic on June 2, 1998, is hereby DENIED.

It is so ORDERED.

The Clerk is DIRECTED to send a copy of this Order and Opinion to all counsel for the parties, and to the third-party defendant Jones and his appointed guardian *ad litem,* James B. Short.

pointed guardian ad litem. However, the same reasoning applicable to the other third-party defendants is also applicable to Jones, and the federal and state claims pending against him.